Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

---

GREENCASTLE TOWNSHIP IN PUTNAM COUNTY and KERCHEVAL, County Treasurer, &c., *v.* BLACK.

Complaint by *A.,* filed on behalf of himself and others, against *Greencastle* township in *Putnam* county, and *B.,* the county treasurer, to enjoin the collection of a tax assessed by said township, under s. 130, c. 98, 1 R. S. 1852. The answer of the township admitted *B.'s* tax as stated, but denied the same as to the others for whom he sued. It also admitted facts which *B.,* in his answer, denied. It also alleged, by way of estoppel, that *B.* voted at the election by virtue of which the assessment was made.

*Held,* that the admissions of the township could not be qualified by *B.'s* answer.

*Held,* also, that a decree, upon demurrer to the answers, enjoining the collection of "all and any of the taxes named in the complaint," was too broad.

*Held,* also, that *B.* was not estopped, by having voted at the election, from denying the legality of the assessment.

Section 130, c. 98, 1 R. S. 1852, which provides that "the voters of any township shall have power, at any general or special meeting, to vote a tax for the purpose of building or repairing school houses, and purchasing sites therefor, providing fuel, furniture, maps, apparatus, libraries or increase thereof, or to discharge debts incurred therefor, and for continuing their schools after the public funds shall have been expended, to any amount not exceeding annually fifty cents on each one hundred dollars of property, and fifty cents on each poll," is, as to the mode of levying tax and paying tuition, repugnant to the constitution.

The discretion of Courts is more restricted in applying the rules of construction to a plan of government contained in a written constitution, than in the construction of statutes.

In the construction of the constitution, words must be understood to have been used in their natural sense.

In the construction of the constitution, Courts have nothing to do with the argument from inconvenience—their duty being simply to declare what the constitution has said.

---

*Note.*—The opinion given in this case on overruling the petition for a rehearing, was delivered on the 16th day of *January,* 1855, but is inserted immediately after the original opinion, by request of the Court; and the *syllabus* applies to both opinions.

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

Tuesday,
December 12.

APPEAL from the *Putnam* Circuit Court.

Hovey, J.—*Alexander Black* filed a complaint in the *Putnam* Circuit Court, on behalf of himself and other resident citizens of *Greencastle* township, in *Putnam* county, for the purpose of enjoining the collection of a tax assessed by said township, under the 130th section of the 98th chapter of the 1st volume of the revised statutes.

The complaint states, that at the *April* election, 1853, a proposition was submitted by the trustees of said township to the voters thereof, for the purpose of assessing a tax of 15 cents on each 100 dollars' worth of property, and 25 cents on each poll, in the township, for common school purposes; that they voted in favor of such assessment, and that the same was accordingly assessed by the trustees. That *Black's* taxes under said assessment amounted to 26 dollars and 20 cents, and the other citizens for whom he sued to 1,200 dollars; that a duplicate had issued to the county treasurer to collect and pay over said taxes to the township; and that the township was threatening to collect, and would collect it, unless restrained. The complaint avers, that the levy and taxation were not uniform throughout the state, and concludes with a prayer for an injunction. The complaint is sworn to.

*Greencastle* township answers in two paragraphs. In the first the answer denies the complaint generally, except as to express admissions. It then sets out a special meeting in *May*, 1853, at which the voters voted a tax for the purpose of "building school houses, and purchasing sites therefor, providing fuel, and for continuing schools, after the public funds might be expended," of the same amount as stated in the complaint, and that a duplicate of such tax had been placed in the hands of the county treasurer for collection. It admits *Black's* tax as stated, but denies the same as to others for whom he sues; denies threats, but admits that the treasurer will collect, and avers that he ought not to be enjoined.

The second paragraph alleges that *Black* was a voter, and voted at the election; and insists that he is estopped from denying the legality of the assessment.

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

*Kercheval*, the treasurer, answers by denying the complaint in general terms, but admits the duplicate, with *Black's* tax, and that he intends to collect it, unless restrained.

Demurrers were filed to each paragraph, assigning for cause that they did not contain sufficient answer or defence to the matters charged in the complaint.

The Court sustained the demurrers, the defendants failed to make further answer, and upon the filing and approval of an injunction bond, the Court decreed a perpetual injunction, "prohibiting and enjoining the defendants from collecting all and any of the taxes named in the complaint." The defendants appealed.

The answers of the township and *Kercheval* must be considered as one. The admissions of the township, the party in interest, can not be qualified by the answer of *Kercheval*, who is only her agent in collecting the taxes. In this view the pleadings substantially admit that the township levied the tax under the 130th section; that a duplicate of that tax was in the hands of *Kercheval*, for collection; that *Black's* tax, as stated in his complaint, was embraced in the duplicate, and that, unless restrained, they intended to proceed in making collections. We do not think the variance in regard to the time of holding the election material, and we deem it unnecessary to notice at length several minor points raised by counsel in regard to the pleadings. The admissions by the pleadings raise three questions for consideration.

First. Is *Black* estopped from denying the legality of the assessment?

Second. Is section 130, under which the tax was assessed, constitutional?

Third. Is the decree sustained by the admitted facts?

1. *Black* voted at the election, and the appellants insist that he is thereby estopped from denying its legality. The case of *Rex* v. *Slythe*, 6 Barn. and Cress. 240, is cited to support this position; but that case only decides that a corporator who attends and votes at a meeting for the election of officers of a borough, will not be permitted to impeach the title of the persons there elected, on account of

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

the want of title in the presiding officers at such election. In this case, *Black* not only attempts to deny the right of officers to preside at the election, but also the constitutionality of the law authorizing it to be holden. We can not carry the doctrine of estoppel to the extreme of denying him that right.

This brings us to the second and principal question in the cause.

2. For the purpose of understanding the full purport and meaning of the sections in our present constitution in regard to common schools, it may not be improper to take a cursory view of the school system in this state.

The constitution of 1816 asserted that knowledge and learning, generally diffused throughout the community, were essential to a free government; and provided that it should be the duty of the general assembly, as soon as circumstances would permit, to provide by law for a general system of education, ascending in a regular gradation from township schools to a state university, wherein tuition should be free, and equally open to all. See sections 1 and 2, art. 9.

As early as 1818 the general assembly passed laws in regard to public schools, and the revised statutes of 1824, 1831, and 1838, contain "acts incorporating congressional townships, and providing for public schools therein." In the R. S. 1843 the school laws were revised, and amended in a lengthy chapter, under the title of "common schools," and in 1849 an "act to increase and extend the benefit of common schools," was enacted, which considerably enlarged the former system, but no county was to be bound by its provisions until it was assented to by a majority of its popular vote. Several counties in the state never assented to this act. Besides these, many local laws were enacted, for the management of schools in different counties and townships throughout the state, dissimilar in many respects to each other, and to the general law.

These laws gave the officers having control of the system the management of the school funds, the right to rent and sell school lands, and in some instances to levy taxes for the support of schools.

Under their operation large sums of money were wasted, and some of the most valuable lands in the state sacrificed, without producing any perceptible results.   Every step in legislation seemed to involve the system in greater expense and difficulty, until inefficiency, confusion and waste seemed to be the legitimate offspring of our legislation on that subject.   Such was the well-known condition of the common school system, when the constitutional convention of 1851 adopted the following sections:   · ·

"Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government, it shall be the duty of the general assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide by law for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all."   Sec. 1, art. 8.

"The general assembly shall not pass local or special laws, in any of the following enumerated cases, that is to say:

"Regulating the jurisdiction and duties of justices of the peace, and of constables," &c.

"Providing for supporting common schools, and for the preservation of school funds," &c.   Sec. 22, art. 4.

The object of both these sections was to provide, not only that a "general system of education" should be established, as was required by the constitution of 1816, but that such system should be both general and uniform; and for the purpose of more effectually securing that result, the 22d section places it beyond the power of the general assembly to pass local or special laws, "providing for supporting common schools."

In compliance with the requirements of the foregoing constitutional provisions, the legislature that succeeded the adoption of the constitution, passed "an act to provide for a general and uniform system of common schools and school libraries, and matters properly connected therewith," approved *June* 14, 1852.   The following are the first and second sections of that act:

"SECTION 1. *Be it enacted by the General Assembly of*
VOL. V.—36

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

*the state of Indiana,* That there shall be annually assessed and collected, as the state and county revenues are assessed and collected, first, on the list of property taxable for state purposes, the sum of ten cents on each one hundred dollars.

"SEC. 2. The funds heretofore known and designated as the congressional township fund, the surplus revenue fund, the county common school fund, and all funds heretofore appropriated to common schools, the saline fund, the bank tax fund, shall, together with the fund which shall be derived from the sale of the county seminaries and the property belonging thereto, from the fines assessed for breaches of the penal laws of the state, and from all forfeitures which may accrue, all lands, and other estates which shall escheat to the state for want of heirs or kindred entitled to the inheritance, all lands which have been, or may hereafter be granted to the state where no special purpose is expressed in the grant, and the proceeds of the sales thereof, including the proceeds of the sales of the swamp lands granted to the state of *Indiana* by the act of congress of 28th *September,* 1850, and deducting the expenses of selecting and draining the same, the taxes which may from time to time be assessed upon the property of corporations for common school purposes, the fund arising from the 114th section of the charter of the state bank of *Indiana,* and unreclaimed fees as provided by law, shall be denominated the common school fund, the income of which, together with the taxes mentioned and specified in the first section of this act, shall be applied to the support of common schools."

From the sources contained in these sections the common school fund was to be derived, and provision is made in other sections of the same act for the equal distribution of the proceeds arising from this fund, among the several counties. Thus far there is no controversy as to the act being general and uniform throughout the state. But the principal question in this case arises out of the 130th section of the same act, which provides that—

"The voters of any township shall have power at any general or special meeting, to vote a tax for the purpose of building or repairing school houses, and purchasing sites

therefor, providing fuel, furniture, maps, apparatus, libraries or increase thereof, or to discharge debts incurred therefor, and for continuing their schools after the public funds shall have been expended, to any amount not exceeding annually fifty cents on each one hundred dollars of property, and fifty cents on each poll."

Nov. Term,
1854.

Greencas-
tle Town-
ship, &c.
v.
Black.

Is this section constitutional? We are of the opinion that it is not.

Before we proceed to the consideration of the constitutionality of this section, we would remark that its phraseology seems to indicate that the legislature did not regard the taxes to be raised by it as being of a public character; for one of the specified causes for making the assessment is, "for continuing their schools after the public funds shall have been expended;" thus making a distinction between the "public funds," and those contemplated by the section.

It was evidently the intention of the framers of the constitution to place the common school system under the direct control and supervision of the state, and make it a *quasi* department of the state government.

To control and manage this department, the constitution provides for the election of a superintendent of public instruction by the popular vote, and enjoins upon the legislature the duty of providing by law for a general and uniform system, wherein tuition is to be without charge, and open to all. Placed in this condition, the state occupies the position of a parent to her children, whose duty it is to see that all are equally provided with the means of education. For the purpose of supplying such means, the constitution authorizes her not only to use the funds heretofore set apart for that purpose, but to compel the elder brothers of the same family, by "a uniform and equal rate of assessment and taxation," to aid her in carrying out the scheme; and as the diffusion of knowledge and learning is regarded by the constitution as "essential to the preservation of free governments," it would seem but just that those who enjoy such a government should equally assist in contributing to its preservation. The inhabitants of one county or township should not be compelled to bear greater

Nov. Term,
1854.

Greencas-
tle Town-
ship, &c.
v.
Black.

burdens than are borne by all. Again: if the provisions of section 130 are to be regarded as constitutional, the uniformity of the common school system would be at once destroyed. In some townships, taxes would be assessed by vote, and in others not; in some, a sufficient amount might be raised to support their schools six, nine or twelve. months; so that there would really exist no uniformity either as to the time the school should be kept, or as to the amount of the taxes to be paid by the inhabitants of the respective townships.

But the want of uniformity would not be the only evil resulting from such a construction, as the power of controlling schools would necessarily, to a great extent, pass from the state and the superintendent into the hands of the local authorities of the different townships. Should the legislature pass a law for the assessment of a mere nominal tax, (a supposition not remote from probability,) the whole school system would be left to the mercy of a popular vote of the different townships; and thus all the evils of the old system which were intended to be avoided by the new constitution—inequality in education, inequality of taxation, lack of uniformity in schools, and a shrinking from legislative responsibilities, would be the inevitable result.

It is useless to urge that the operation of section 130 is and might be uniform throughout the state. The character of its provisions renders such a result impossible; and even if it should so happen that every township in the state should assess the same rate of taxation, the assessment would not be the less unconstitutional on account of such an accident.

It has long since been beautifully declared by high authority, that "a corrupt tree can not bring forth good fruit." An unconstitutional provision can not be the basis of lawful proceedings.

The counsel for the appellants contend that if cities, towns and counties can assess taxes for local purposes, the same power must necessarily belong to incorporated townships. We are not prepared to deny that the legislature

might confer such power upon them for certain local purposes; but where the taxes when collected are to be used for state purposes, the constitution requires that—

"The general assembly shall provide, by law, for a uniform and equal rate of assessment and taxation; and shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal, excepting such only for municipal, educational, literary, scientific, religious or charitable purposes, as may be specially exempted by law." Sec. 1, art. 10.

The phraseology of this section shows that it was not intended to apply to local assessments. The words "uniform and equal rate of assessment and taxation," and "all property, both real and personal," clearly refer to general assessments to be made for the state at large.

We have refrained from noticing cases of seeming similarity in other states, as those cases were not controlled by constitutions like ours. In several of the eastern states, it is understood that townships now and for many years past, have exercised powers similar to those claimed in this case by *Greencastle* township; but by an examination, it will be found that there is scarcely a shade of similitude between their constitutions and ours, in regard to schools and taxation.

The difficulties anticipated by counsel from the construction which we have reluctantly felt constrained to adopt, do not seem to us insurmountable, as we can easily conceive of a constitutional system which would work no injustice to any one. But even if such a system could not be devised, we will not bend the constitution to suit the law of the hour.

3. The decree enjoining "all and any of the taxes named in the complaint," is too broad. While the answers admit *Black's* taxes as stated in the complaint, they pointedly deny the taxes of others for whom he sues, and his authority to sue for them. These facts are admitted by the demurrers, and the injunction should have been confined to the taxes assessed against *Black*.

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

*Per Curiam.*—The decree is affirmed as to the taxes assessed against *Black*, and reversed as to the taxes assessed against those for whom he sues. Cause remanded, &c.

*H. Secrest*, *D. R. Williamson*, and *D. R. Eckels*, for the appellants.

*J. Cowgill* and *D. McDonald*, for the appellee.