MATTHEWS *v.* STATE OF INDIANA.

[No. 29,574. Filed March 6, 1958.]

*John D. Clouse* and *Carrol F. Dillon,* of counsel, both of Evansville, for appellant.

*Edwin K. Steers,* Attorney General, and *Owen S. Boling,* Deputy Attorney General, for appellee.

BOBBITT, J.—Appellant was charged by affidavit in two counts; tried by jury; and found guilty of assault under Count No. 1, and as charged in Count No. 2. Count No. 1 charged assault and battery with intent to commit murder under Acts 1927, ch. 203, §2, p. 580, being §10-401, Burns' 1956 Replacement; and Count

No. 2 charged the carrying of a pistol without a license therefor under Acts 1935, ch. 63, §§3 and 15, p. 159, being §10-4736 and §10-4747, Burns' 1956 Replacement. (Uniform Firearms Act.)

The jury fixed appellant's penalty under Count No. 1, but did not fix the punishment under Count No. 2. This was done by the court.

Four questions are determinative of the issues in this case.

*First:* Appellant asserts that the first count of the affidavit was incorrectly pleaded and the evidence is not sufficient to sustain the conviction because the affidavit charged an assault with intent to murder Napoleon Davis, while the evidence shows that his assault was directed against one George Shipp, although, in fact, he accidentally shot Davis.

Appellant further contends that, because the affidavit did not allege that he "assaulted Shipp, with the intent to murder him, and inadvertently" shot Davis, there was a variance in the proof which misled him in his defense, and the trial court erred in giving appellee's Instruction No. 1 as follows:

> "When one intends to assault a certain person with a deadly weapon, and by mistake or inadvertence assaults another person with such weapon, in the eyes of the law his intent is transferred from the person to whom it was directed to the person actually assaulted; and a person committing such an act is deemed guilty of assault with a deadly weapon, in like effect as if he had originally intended to attack the person thus assaulted through mistake or inadvertence."

This question has been decided adversely to appellant in *Noelke* v. *State* (1938), 214 Ind. 427, 430-434, 15 N. E. 2d 950, and we see no reason to disturb the

ruling in that case. The trial court did not err in giving appellee's Instruction No. 1, and appellant's complaint of the variance between the affidavit and the proof is without merit.

*Second:* The jury found appellant guilty on- the second count of the affidavit, and that he was 38 years of age, but did not fix the penalty. However, appellant, before the jury was discharged, suggested that the court should fix the penalty under Count No. 2 of the affidavit. The prosecuting attorney concurred in this suggestion. The error here, if any, was invited by appellant and he cannot complain of an alleged error which he induced the trial court to commit. *The State* v. *Arnold* (1896), 144 Ind. 651, 657, 42 N. E. 1095, 43 N. E. 871; *Duncan* v. *State* (1908), 171 Ind. 444, 447, 86 N. E. 641; *Domestic Block Coal Co.* v. *DeArmey* (1913), 179 Ind. 592, 606, 100 N. E. 675; *Switzer* v. *State* (1937), 211 Ind. 690, 701, 8 N. E. 2d 80.

*Third:* Appellant further asserts that the Legislature has attempted to delegate discretionary duties to the Superintendent of State Police without providing sufficient standards under which such discretion is to be exercised and, therefore, the Uniform Firearms Act violates §1, Art. 4 of the Constitution of Indiana, and the Due Process Clause of the 14th Amendment of the United States Constitution.

Reasonable standards must be imposed where the Legislature delegates discretionary powers to an administrative officer. *Ennis* v. *State Highway Commission* (1952), 231 Ind. 311, 326, 108 N. E. 2d 687. However, the policy of the Legislature and the standards to guide the administrative agency may be laid down in very broad and general

terms. Such terms get precision from the knowledge and experience of men whose duty it is to administer the statutes, and then such statutes become reasonably certain guides in carrying out the will and intent of the Legislature. *Mutual Film Corp.* v. *Ohio Indus'l. Comm.* (1915), 236 U. S. 230, 245, 59 L. Ed. 552, 560, 35 S. Ct. 387; 42 Am. Jur., Public Administrative Law, §45, p. 346.

Courts generally are less strict in requiring specific standards to guide the licensor where the subject-matter of the Act is closely related to the public safety, health, morals or general welfare.[1] 73 C. J. S., Public Administrative Bodies and Procedure, §30, p. 329.

It seems to us that the regulation of the possession of firearms is closely related to the public safety and welfare, and we should be guided in our deliberation here by the rule immediately above stated. Under this rule general standards will be sufficient here, provided there is an opportunity for a court review of possible arbitrary or capricious action by the local police officer or Superintendent of State Police.

This is not an action where appellant is complaining of any arbitrary or capricious action by the local Chief of Police or the Superintendent of State Police in denying him a license to carry a pistol; nor is this an attack on any rules or regulations prepared or promulgated by the licensing officer. The sole question

---

1. Compare *Lee* v. *Delmont* (1949), 228 Minn. 101, 36 N. W. 2d 530 (barbers) and *State ex rel.* v. *Fields et al.* (1924), 218 Mo. App. 155, 263 S. W. 853 (pool halls) with *Weiner* v. *Borough of Stratford, County of Camden* (1954), 15 N. J. 295, 104 A. 2d 659 (license to conduct a new business) and *State* v. *Ballance* (1949), 229 N. C. 764, 51 S. E. 2d 731, 7 A. L. R. 2d 407 (photography).

then presented is whether the statute[2] is invalid because it fails to provide sufficient standards to guide the licensing officer in the administration of the Act.

Chapter 63, Acts 1935, as amended,[2] provides, in parts here pertinent, that no person shall carry a pistol except in his "place of abode or fixed place of business," without a license therefor (§3). Certain persons, including police officers and members of the armed forces, are exempt from the Act (§4). The procedure for issuance of the license is set out in §5 and provides that a person desiring a license shall apply to the Chief of Police or the County Sheriff; and, further,

"The officer to whom the application is made shall ascertain concerning the applicant his name, address, length of residence in the community, race, citizenship, age, criminal record, if any, occupation, place of business, character, reputation, experience with firearms and reason for desiring a license. The desire to engage in target practice is a proper reason. The officer to whom the application is made shall forward this information together with his recommendation to the superintendent of state police, who may make whatever further investigation he deems necessary and shall issue to the applicant a qualified or unlimited license to carry a pistol for not more than one [1] year from the date of issue, if it appears that the applicant has a proper reason for carying a pistol and is of good character and reputation and a suitable person to be so licensed." Acts 1943, ch. 156, §1, p. 466, being §10-4738 (1), Burns' 1956 Replacement.

The licensing officer is authorized to prescribe the form of all licenses and applications, and the manner in which the information concerning each applicant is to be obtained and furnished to him (§5(2)). An application must be granted or rejected within 30

---

2. This is the Uniform Firearms Act as adopted in Indiana.

days after it is filed and "Any person aggrieved by the failure of the officer to whom the application is made to recommend him for any license provided for by this act or of the state licensing officer to issue such license, or by a revocation of his license, may have the decision reviewed by the circuit court." (§5(3)).

Thus it is readily apparent that the Act fixes the general standard of fitness, character, and reputation necessary to require the issuance of a license and provides a review by the Circuit Court to protect the applicant against any arbitrary, capricious or fraudulent action by the licensing officers.

Whether the applicant "has a proper reason for carrying a pistol and is of good character and reputation and a suitable person to be so licensed" are questions of fact; and the Legislature may delegate the function of determining these facts upon which the execution of the legislative policy, as expressed in the Act, is dependent. *Douglas* v. *Noble* (1923), 261 U. S. 165, 67 L. Ed. 590, 43 S. Ct. 303; *Clayton* v. *Bennett* (1956), 5 Utah 2d 152, 298 P. 2d 531; *Whittle* v. *Nesmith* (1951), 255 Ala. 193, 51 So. 2d 6.[3]

It is our opinion that the Superintendent of State Police, with his special training and experience, and

3. For other cases where standards similar to those prescribed in the Uniform Firearms Act have been held sufficient, See: *McDonough* v. *Goodcell* (1939), 13 Cal. 2d 741, 91 P. 2d 1035, 123 A. L. R. 1205 (bail bond business); *Thompson* v. *Tobacco Root Co-op.* (1948), 121 Mont. 445, 193 P. 2d 811 (grass conservation districts); *Falkner* v. *Memorial Gardens Association* (1957), Tex. Civ. App., 298 S. W. 2d 934 (prepaid funeral benefits); *Pierstorff* v. *Board of Embalmers* (1941), 68 Ohio App. 453, 41 N. E. 2d 889 (appeal dismissed, 138 Ohio St. 626, 37 N. E. 2d 545) (funeral directors); *Prata Undertaking Co.* v. *Bd. of Embalming* (1936), 55 R. I. 454, 182 Atl. 808, 104 A. L. R. 389 (funeral director); *State ex rel.* v. *Fields et al.* (1924), 218 Mo. App. 155, 263 S. W. 853 (pool halls); *Santoro* v. *Mirshel* (1945), 184 Misc. 666, 55 N. Y. S. 2d 328 (affirmed, 269 App. Div. 1046, 59 N. Y. S. 2d 279 (restaurants); *Adams* v. *New Kensington* (1947), 357 Pa. 557, 55 A. 2d 392 (juke bokes).

with the facilities which he has at his command for securing information, is capable and qualified to determine whether an applicant for a license to carry a pistol has a "proper reason" therefor, and whether he is a "suitable person" to have a pistol in his possession at will. The Legislature could not determine these facts in each individual case, and unless such ministerial duties are delegated to some competent person, with authority to execute the will of the Legislature upon proper showing of facts, such laws would become a nullity because of a lack of machinery for their enforcement.

When the statute here in question provides that the Superintendent of State Police *shall* issue to the applicant a license, if it appears that he is of good character and reputation and a suitable person, it requires that such Superintendent must determine whether or not the applicant meets these qualifications and if, in the opinion of the Superintendent the conditions of the statute are met, he has no discretion in the matter but must issue the license.

For the reasons above stated, we find no unlawful delegation of legislative power in the statute here in question and it does not violate the Due Process Clause of the 14th Amendment of the United States Constitution or Art. 4, §1, of the Indiana Constitution.

*Fourth:* Appellant further asserts that the Firearms Act violates Art. 1, §32 of the Indiana Constitution which provides that "The people shall have a right to bear arms, for the defense of themselves and the State," because it restricts the right of the people to bear arms for their own defense.

The purpose of the Firearms Act is to achieve a

maximum degree of control over criminal and careless uses of certain types of firearms, while at the same time making them available to persons where needed for protection.[4]

The Legislature has the power, in the interest of public safety and welfare, to provide reasonable regulations for the use of firearms which may be readily concealed, such as pistols.[5] *McIntyre* v. *State* (1908), 170 Ind. 163, 83 N. E. 1005; *State* v. *Hart* (1945), 66 Idaho 217, 157 P. 2d 72; *Hill* v. *The State of Georgia* (1874), 53 Ga. 472; *Salina* v. *Blaksley* (1905), 72 Kan. 230, 83 Pac. 619, 115 Am. St. Rep. 196, 3 L. R. A. (N. S.) 168; *The State* v. *Buzzard* (1842), 4 Ark. 18; *State* v. *Tully* (1939), 198 Wash. 605, 89 P. 2d 517, (Upholding a similar statute under a like constitutional provision) ; *United States* v. *Miller* (1939), 307 U. S. 174, 83 L. Ed. 1206, 59 S. Ct. 816.

The provisions of §10-4736, *supra,* do not restrict nor prohibit appellant or any other person from having a pistol in his home or "fixed place of business" for the defense of himself and the State. Neither does such Act attempt to restrict or prohibit the use of firearms other than pistols, as they are defined in §1 of the Act.

Article 1, §32, *supra,* does not say that the people shall have a right to bear pistols, or any other specific kind or type of arms.

Since, under the Act here under consideration, people may carry pistols in their homes and fixed places

---

4. See: 98 University of Pennsylvania Law Review, p. 905, for a comprehensive discussion of state and federal firearms legislation.

5. Acts 1935, ch. 63, §1, defines a pistol as any firearm with barrel less than 12 inches in length.

of business, without a license, and other kinds and types of firearms any place, we are unable to see wherein it contravenes any of the provisions of Art. 1, §32 of the Indiana Constitution.

For the reasons above stated, ch. 63, Acts 1935, as amended, does not violate the above provisions of the Indiana Constitution.

Appellant having failed to show reversible error, the judgment of the trial court is affirmed.

Judgment affirmed.

Landis, Achor and Arterburn, JJ., concur.

Emmert, C. J., concurs in part and dissents in part with opinion.

## DISSENTING OPINION

EMMERT, C. J.—I concur in affirming the judgment on Count 1 of the affidavit, but I dissent from the decision that the judgment on Count 2 should be affirmed.

Count 2 in substance charged that appellant feloniously carried a pistol on his person, ". . . not then and there being in his place of abode or fixed place of business; and not then and there having a license from the State of Indiana to so carry said pistol." Appellant properly raised the constitutionality of §3 of ch. 63 of the 1935 Acts (Uniform Firearms Act), §10-4736, Burns' 1956 Replacement, by a motion to quash and a special answer, followed by a specification in a motion for new trial that the verdict on Count 2 was contrary to law.

Section 10-4736, Burns' 1956 Replacement, provides as follows:

"No person shall carry a pistol in any vehicle or on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided."

There was no evidence that appellant was a person exempted from the Act under §10-4737, Burns' 1956 Replacement, but appellant makes the contention that §3 of the Act, §10-4736, Burns' 1956 Replacement, is a violation of §32 of Article 1 of the Constitution of Indiana, which states: "The people shall have a right to bear arms, for the defense of themselves and the State." It is to be noted that this constitutional protection is in the identical language of the first clause of §20 of Article 1 of the 1816 Constitution of Indiana.[1] The Indiana constitutional right to bear arms is not based only in aid of the militia as is the Second Amendment to the Federal Constitution, which states: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." Nor does the Indiana Constitution guaranteeing the inalienable right of self-defense, specifically grant the General Assembly the right to regulate the carrying of weapons.[2] The constitutional right to bear arms in Indiana is stated in clear and simple language, and neither this court nor the Legislature, even when it enacts a Uniform Firearms Act, has any right to disregard a single well-chosen word, nor deprive an accused of a right granted by the Constitution. We should "not bend the constitution to suit the law of the hour." *Greencastle Twp.* v. *Black* (1854), 5 Ind. 557, 565. If constitutional rights are to mean anything, they must protect the guilty as

1. The concluding clause of §20 of the 1816 Constitution is, "and that the military shall be kept in strict subordination to the civil power."

2. "The right of a citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power, when thereunto legally summoned, shall never be prohibited; but nothing herein contained shall prevent the Legislature from regulating the carrying of weapons." Section 26, Article 2, Constitution of Oklahoma. The Texas Constitution specifically gives its Legislature similar power.

well as the innocent. *Batchelor* v. *State* (1920), 189 Ind. 69, 84, 125 N. E. 773. We are not considering a constitutional provision which may bring in a mixed question of law and fact or the reasonableness of a regulation, as may be the case under the Fourteenth Amendment; all that is involved in the appeal at bar is a question of law.

The decisions from other jurisdictions are not uniform on the right to keep and bear arms any more than the constitutional provisions are stated in the same language. Few of the decisions make any historical analysis of the cause for constitutional guarantees of the right to bear arms being considered so important by the Forefathers, nor do they consider the future effect of the precedent being made as to the right of the Legislature to make more drastic regulations and prohibitions. But the Supreme Court of Michigan has well noted the constitutional right to bear arms in America had its origin in the fear of a standing army as well as a necessity of self-protection in a frontier society. See *People* v. *Brown* (1931), 253 Mich. 537, 235 N. W. 245, 82 A. L. R. 341. The English Bill of Rights (1688) had declared against the keeping of a standing army without the consent of Parliament, and that certain subjects should "have arms for their defense suitable to their conditions, and as allowed by law." The British Parliament is not restrained by any written Constitution, but the American theory of government is that both the Legislative and the Executive must be restrained and limited by a written constitution.

It seems too plain for doubt that out of the bitter experiences of the French and Indian Wars and American Revolution came the deep realization that the inalienable right of self-defense should be protected

by constitutional guarantees beyond the power of any temporary majority in the Legislature to circumvent or abolish. The Indiana right to defense is in almost the identical language of the Pennsylvania Constitution of 1776 which stated: "That the People have a Right to bear Arms for the Defence of themselves and the State; and as Standing Armies, in the Time of Peace, are dangerous to Liberty, they ought not to be kept up: And that the Military should be kept under strict Subordination to, and Governed by the Civil Power." Section the Thirteenth, Chapter 1, Pennsylvania Constitution of 1776.[3] Although the Pennsylvania Dutch gunsmiths in Lancaster County started their production of guns by 1720, many on the frontier were without arms. In 1775 Conrad Weiser had written Governor Morris of his attempt to defend the Paxton people above Hunter's Mill, and reported that he "gave orders to them to go home and fetch their Arms, whether Guns, Swords, pitchforks, axes, or whatsoever might be of use against the enemy." J. I. Mombert, Authentic History of Lancaster County, Penn., p. 159. Nor was the situation much better on the frontier in the Shenandoah Valley where Washington in 1756 found that for 200 Culpeper militiamen there were only eighty firelocks. Vol. 2, Douglas Southall Freeman, George Washington, p. 185.

The Continental Congress on July 18, 1775, resolved that it be recommended to the various Colonies that all able-bodied effective men, between 16 and 50 years of age be formed into regular companies of militia, but the difficulty of finding arms still persisted. Many

---

3. The Pennsylvania Constitution of 1790 restated the prohibition with a slight change of language. "That the right of citizens to bear arms, in defence of themselves and the State, shall not be questioned." Section XXI, Article IX.

militiamen had arms unsuitable for use in the field. It was easier to get men than to arm them.[4] In the siege of Boston when the Connecticut militia returned home, those who had suitable arms had them seized by the army with arrangements made for compensation. But the historical evidence is undisputed that before the close of the Revolution muzzle-loaded flintlock pistols were being owned and used by some members of the Continental Army; so the right to bear arms as first recognized by the Forefathers not only included cutting swords, muskets, rifles and shotguns, but also pistols.[5] Arms were not only necessary for the equipment of the militia (see *U. S.* v. *Miller* (1939), 307 U. S. 174, 59 S. Ct. 816, 83 L. Ed. 1206), but the necessities of each man being in a position to protect himself and his property were so obvious that the Forefathers chose not to rely upon mere legislation to guarantee the right.

When our 1816 Constitution was adopted, the War of 1812 had hardly finished. The militia of Kentucky and some from Indiana Territory had fought under William Henry Harrison. Only a comparatively few pioneers had settled in the southern part of the State and along the Ohio state line. If the pioneer had money he had to protect it himself, and if he wanted personal

---

4. "If what he had observed in Virginia was typical of conditions in the other Colonies, it was far easier to get men than to arm them. Expanded manufacture of firelocks and explosives would be difficult to begin and of doubtful issue." Vol. 3, Douglas Southall Freeman, George Washington, p. 442."

5. "The men who carried these pistols [in the American Revolution] came from three branches of the service and included some of the most famous and colorful units of the war. There were the cavalry of both armies, the navies, and selected infantry regiments." p. 31.
"The largest manufactury of pistols in America was the Rappahannock Forge at Falmouth, Virginia." p. 32. Harold L. Peterson, Pistols in the American Revolution. American Rifleman, October 1955, pp. 31-33.

security for himself, his family or his cabin, he had to accomplish it by self help. Every free white able-bodied male, not a conscientous objector, between 18 and 45 years of age, belonged to the militia. Act VII, 1816 Constitution of Indiana. He had to have the right to bear arms for his defense and the defense of the State; hence this inalienable right was incorporated in the Constitution as it was understood from the time of the American Revolution to 1816. Of necessity, the guaranty also embraced the right to have ammunition and the opportunity to become proficient in the use of arms so long as no trespass was committed upon the rights of others.

It was early held that the 1831 statute prohibiting anyone except travelers from wearing or carrying concealed weapons was constitutional. *State* v. *Mitchell* (1833), 3 Blackf. 229. The militia was never on duty armed with concealed weapons. The bearing of arms was unconcealed. This in no way limited the right to bear arms unconcealed, and not until the present Uniform Firearms Act has any statute attempted to abolish what the Constitution protects.

Since 1816 this State has gotten along very well maintaining law and order under the various statutes prohibiting the carrying of concealed weapons, while at the same time the owners of pistols had the right to take them hunting or target shooting unconcealed without a permit and without being branded as a criminal. The 1925 Firearms Act (ch. 207, Acts 1925) did not prevent carrying unconcealed pistols, and under it the crime rate for crimes of violence was less than it has been under the 1935 Uniform Act. The effect of such unconstitutional regulation as prescribed by the latter Act has always been to disarm the law-abiding

citizen, while the criminal pays no attention to the law. Such legislation really provides greater security for the outlaw.

It is often assumed in some of the cases that a change in the constitutional right to bear arms must be made in the exercise of the police power of the State for the protection of the health, safety and general welfare of the people. The same argument could be presented for the impairment of the constitutional right to be free from unreasonable searches and seizures, which has roots in the pre-Revolutionary Writs of Assistance used to oppress the people of Massachusetts. What is overlooked is the obvious fact that the constitutional right to bear arms is in itself an exercise of the sovereign police power, and being a part of the Constitution, the Legislature has been prohibited from legislating any part of it out of existence.

Nor can it be maintained that the right to bear arms only protects the use of muskets, muzzle-loading rifles, shotguns[6] and pistols, because they were the only ones used by the Colonists at the time. It might as well be argued that only a house of the architectural vintage of the Revolution would be protected against a present unreasonable search and seizure. Modern guns suitable for hunting and defense are within the protection of our Bill of Rights just the same as the owner of a modern ranch house type home is protected against unlawful searches.

If the Legislature can prohibit the carrying of an unconcealed pistol without a permit, with equal logic it can prohibit the carrying of an unconcealed rifle or shotgun without a permit. The advocates of a

---

6. Boone at the Battle of Blue Licks in 1782 was fighting with a shotgun loaded with ball and buckshot. John Bakeless, Daniel Boone, p. 298.

Police State by restrictive legislation or administrative rules always seem around and busy trying to restrict freedom and constitutional rights. Their plan is always cleverly designed to take a small chip at a time, for "many strokes overthrow the tallest oaks."

If we are to heed the lessons of modern history, it is self-evident our Bill of Rights should be construed liberally in favor of the individual and against restrictive legislation. When the Boston Police Strike resulted in areas of local anarchy within the city, the only protection for private property was the owner's armed guard. We have often been cited to the example of England and her restrictive firearms legislation as the cause for reducing cimes.[7] But it is within the memory of most of us that after Dunkirk, Americans with hunting arms were urged to give them to England to rearm a disarmed population in order to repel Hitler's planned invasion.[8] Had Hitler succeeded, the population would have been disarmed again for Dictators can tolerate no arms among the subject people. Modern History clearly discloses a prime *modus operandi* of the Communist State is the disarming of its civilian population.

Today, we read it is freely predicted that if we sustain an all-out H-bomb war, we shall suffer 65,000,000 or more casualties. No one can predict where they may be, or the extent of a resulting breakdown in law and order. It may well be that the man who survives near the target area will be the one who has prepared to bear arms for his defense. It is never safe to ignore

7. This proposition is untenable, when the many causes, too numerous to discuss here, are analyzed.

8. "We shall fight on the beaches, we shall fight on the landing grounds, we shall fight in the fields and in the streets, we shall fight in the hills, we shall never surrender." Winston Churchill, Speech on Dunkirk, House of Commons, June 4, 1940.

the lessons of History, for too often they are repeated in a different form under changed conditions.

It is a departure in constitutional interpretation to reason that because the Indiana Constitution does not say "the people shall have a right to carry pistols for the defense of themselves and the State" that therefore the Legislature can restrict the right to carry them unconcealed without a permit. With equal force it could be argued that because the Fifth Amendment did not specifically say no person should suffer a judgment against him without notice, that the due process clause of the Amendment would not be violated if a Federal statute authorized a judgment without notice. Neither does our Constitution mention rifles or shotguns. If the Legislature can restrict the carrying of a pistol unconcealed without a permit, it can do the same for rifles and shotguns. Moreover, since pistols are not named in the Constitution, what is to prevent the Legislature from making it a felony to have one at all? By the same reasoning there is nothing to prevent the Legislature from making it a felony to own or possess a shotgun or rifle. Of course the complete disarming of the people is the ultimate objective of the advocate of the Police State, whether he be a misguided reformer or a ruthless Dictator. The greatest danger in the precedent made today lies in the future. It will be used to justify further legislative encroachment on the constitutional right to bear arms, including shotguns and rifles.

For 119 years there was no legislative attempt to abrogate the constitutional right to bear arms as the term was understood in 1816 and at the time of the American Revolution. For 104 years the Legislature never considered the bearing of arms unconcealed could

be made a crime. It is not for this court to substitute its judgment for that of the Forefathers as to what the Constitution should protect, or to indulge in Constitution making under the guise of judicial construction. The philosophy that the end justifies the means can only result in the progressive destruction of constitutional liberties. Many more convictions could be obtained if courts would construe away the protection against self-incrimination and unreasonable searches, but Bills of Rights were adopted to protect the individual against oppression by his Government, whether he be guilty or innocent. If the courts ignore well-settled precedents for the construction of constitutional rights, they become government by judges and not by law. If the constitutional safeguards are to be diminished, it should be done by constitutional amendment, and not by validating legislation that contravenes what the Forefathers and the people made the supreme law of this State.

NOTE.—Reported in 148 N. E. 2d 334.