**Joseph L. SCHUBERT, Jr.,
Petitioner-Appellant,**

**v.**

**Robert L. DeBARD, Superintendent,
Indiana State Police Department,
Respondent-Appellee.**

No. 3–177A10.

Court of Appeals of Indiana,
Third District.

Jan. 15, 1980.

Rehearing Denied March 27, 1980.

Joseph D. Bradley, South Bend, for petitioner-appellant.

Theodore L. Sendak, Atty. Gen., Jack R. O'Neill, Deputy Atty. Gen., Indianapolis, for respondent-appellee.

GARRARD, Presiding Judge.

Appellant, Joseph L. Schubert, applied pursuant to IC 35–23–4.1–5 for a license to carry a handgun. When his application was denied he filed a timely petition for administrative review. IC 4–22–1–24. A hearing was held and the superintendent of the Indiana State Police found that Schubert "did not have a proper reason" to be licensed and denied the permit. The trial court sustained the superintendent, and this appeal follows.[1]

1. *See* IC 4–22–1–14 *et seq.*

The evidence disclosed that in June 1975, appellant applied for a permit to carry a handgun for self-protection. He had previously held such permits. His most recent one expired in July 1973. He had carried a handgun when engaged in part-time employment in the nature of security work. He also had held a special police commission from the City of Fort Wayne and a St. Joseph's County Deputy Sheriff's commission. Both commissions had been revoked prior to his application for the license.

Schubert offered as evidence of the need to protect himself two items he had received in the mail in 1975. One was a copy of a picture of a pig with appellant's name written above it. The other was a letter, signed "The Assassinater's," demanding $1250 or "Pig, you are dead." No method or place of payment was specified. Appellant stated he suspected his brother might have sent the letters. However, he did not discuss the matter with his brother nor report it to the police. He also testified that while photographing the house where his mother lived, in connection with "secret" work for the U.S. Department of the Treasury, his brother ordered him out of the area and fired a rifle at the van in which he was riding. He did notify the prosecutor's office about the shooting incident, but no charges were brought. He claims that as a result of these incidents he fears for his life and needs to carry a gun to protect himself.

A report summarizing a background investigation made of appellant when he applied for a private detective's license in 1971 was admitted without objection. That report concluded that appellant was a "chronic liar" suffering from a "gigantic police complex." The report, as well as testimony of a police officer at the hearing, indicated that on occasion, when he had been licensed to carry a gun, appellant had carried and displayed his pistol at inappropriate times which did not require the use of a gun for personal safety or to expedite the duties of his employment. Moreover, although several of the jobs he had held might be broadly characterized as security work, they appear to have generally involved directing traffic in parking lots. Several of those interviewed during the course of the investigation, including former employers and the sheriff who both created and revoked his deputy sheriff's commission, felt appellant had "mental problems."

The licensing statute, IC 35–23–4.1–5, provides in salient part,

"(a) A person desiring a license to carry a handgun shall apply to the chief of police or corresponding police officer of the municipality in which he resides. If that municipality has no such officer, or if the applicant does not reside in a municipality, he shall apply to the sheriff of the county in which he resides, . . . . The officer to whom the application is made shall conduct an investigation into the applicant's official records and verify thereby the applicant's character and reputation, and shall in addition verify for accuracy the information contained in the application, and shall forward this information together with his recommendation for approval or disapproval . . . to the superintendent who may make whatever further investigation he deems necessary. In addition, whenever disapproval is recommended, the officer to whom the application is made shall provide the superintendent and the applicant with his complete and specific reasons, in writing, for the recommendation of disapproval. *If it appears to the superintendent that the applicant has a proper reason for carrying a handgun and is of good character and reputation and a proper person to be so licensed,* he shall issue to the applicant either a qualified or an unlimited license to carry any handgun or handguns lawfully possessed by the applicant. . . . A license to carry a handgun shall not be issued to any person who has been convicted of a felony violation of this chapter or who has been convicted of a crime of violence, as defined in this chapter, in this State or any State or country." (emphasis added)

■ Establishing such a licensing procedure for handguns is not violative of the right to bear arms as guaranteed by the Second Amendment or Art. 1, Sec. 32 of the Indiana Constitution. *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334.

Schubert contends, however, that the Indiana Constitution affords him the right to bear arms for his own defense. Thus, he urges that where self-defense is properly asserted as the reason for desiring a firearms license, and the applicant is otherwise qualified, the license cannot be withheld upon an administrative official's subjective determination of whether the applicant needs defending.

Our Art. 1, Sec. 32, is worded differently than the Second Amendment.[2] It states simply and plainly,

> "The people shall have a right to bear arms, for the defense of themselves and the State."

■ It is well settled that we are to presume that constitutional language was carefully chosen to express the framer's intention. *State v. Grant Sup. Ct.* (1930), 202 Ind. 197, 172 N.E. 897, 71 A.L.R. 1354; *State v. Dearth* (1929), 201 Ind. 1, 164 N.E. 489. The words used are to be taken in their general and ordinary sense. *Benton Co. Council v. State ex rel. Sparks* (1946), 224 Ind. 114, 65 N.E.2d 116; *Tucker v. State* (1941), 218 Ind. 614, 35 N.E.2d 270.

Moreover, the constitutional debate over this section[3] underscores the framers' intent that two purposes, rather than one, were served by the section.[4] Thus, the introduction to one stage of debate opened with the following,

> "The twelfth section, providing that no law should restrict the right of the people to bear arms, *whether in defense of themselves or of the state,* next came up in order." (emphasis added)

2. "A well-regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."

3. The section was originally proposed and considered as Article 20, Section 12. It became Article 1, Section 32 as finally reported out by the Committee on Revision and adopted by the convention. Convention Journal 1850, 873, 880.

4. Compare the consideration of the Second Amendment in *U. S. v. Miller* (1939), 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206. The debate focused upon whether special language should

2 *Debates in Indiana Convention* 1850, at 1391.

■ We think it clear that our constitution provides our citizenry the right to bear arms for their self-defense. Furthermore, in *Matthews v. State, supra,* our Supreme Court held that if it is determined under IC 35–23–4.1–5 that the applicant has met the conditions of the statute, the superintendent has no discretion to withhold the license. 148 N.E.2d 337.

In Schubert's case it is clear from the record that the superintendent decided the application on the basis that the statutory reference to "a proper reason" vested in him the power and duty to subjectively evaluate an assignment of "self-defense" as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant "needed" to defend himself.

Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.[5]

We therefore hold that Schubert's assigned reason which stood unrefuted was constitutionally a "proper reason" within the meaning of IC 35–23–4.1–5.

We recognize, however, that there was conflicting evidence on Schubert's suitability to be licensed and that those issues were not attempted to be resolved in the original determination.

be included to permit the legislature to regulate the carrying of concealed weapons. 2 *Debates in Indiana Convention* 1850, at 1385, 1391.

5. When stripped of its invective this would be the result of the position advanced by the dissent. Any ordinary citizen applying for license could be "factually" denied a permit because no one had actually threatened him. Thus, he would have no "need" to defend himself. Similarly, if threatened, the permit could be denied on the basis that the official police agencies were capable of handling the matter so that he had no "need" to defend himself.

We therefore reverse the determination and direct that the matter be remanded for a new hearing pursuant to IC 4–22–1–24 and for further proceedings consistent herewith.

Reversed and remanded.

HOFFMAN, J., concurs and files separate opinion.

STATON, J., dissents and files separate opinion.

HOFFMAN, Judge, concurring.

I concur in the majority. I agree that *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334 stands for the proposition set out in the majority opinion, however, I would join in Judge Emmert's dissent in that opinion.

STATON, Judge, dissenting.

I dissent. The Majority has not accurately portrayed State Police Superintendent Robert L. DeBard's reason for denying Joseph Schubert's application to carry a concealed firearm in public. Superintendent DeBard did not, as the Majority indicates, deny the license on the basis that Schubert "did not have a proper reason"; *that quotation by the Majority represents only a portion of the Superintendent's statement.* The *entire* text of DeBard's statement reads:

"2. *That the evidence disclosed that* Joseph L. Schubert, Jr., applicant, does not have a proper reason to be so licensed." (Emphasis added.).

DeBard thus denied the application because, in his role as factfinder, he determined that *the evidence* did not support Schubert's claim that the license to carry a handgun in public was necessary for his self-defense. There is absolutely nothing in the record to indicate that DeBard considered self-defense an improper reason for obtaining the license, as the Majority erroneously indicates.

Without question, Article 1, Section 32 of the Indiana Constitution gives our citizens "a right to bear arms, for the defense of themselves." I reiterate that Superintendent DeBard did not find otherwise. The Majority, however, has used its erroneous reading of DeBard's order, together with the provisions of Art. 1, § 32, as a springboard for the following portion of its opinion, which, as will be explained, contravenes both our legislature's directives and the Supreme Court's holding in *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334. The Majority states:

"*In Schubert's case it is clear from the record that the superintendent decided the application on the basis that the statutory reference to 'a proper reason' vested in him the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant 'needed' to defend himself.*

"*Such an approach contravenes the essential nature of the constitutional guarantee. . . .*" (Emphasis added.).

I am somewhat astounded by the Majority's blithe statement that "it is *clear* from the record that the superintendent decided . . . the statutory reference to 'a proper reason' vested in him the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license . . . ." As heretofore explained, there is nothing to indicate Superintendent DeBard held that opinion.

As his *entire order in fact indicates*, however, the Superintendent did hold the opinion that he was empowered to evaluate the *evidence* regarding Schubert's claim that he needed to carry a concealed firearm in public to protect himself. The Superintendent no doubt gained that belief from a reading of IC 1971, 35–23–4.1–5, Ind.Ann.Stat. § 10–4751e (Burns Code Ed.), wherein the legislature expressly granted him that power. The statute reads in pertinent part:

"A person desiring a license to carry a handgun shall apply to the chief of police or corresponding police officer of the municipality in which he resides . . . .

\*     \*     \*     \*     \*     \*

"The officer to whom the application is made shall conduct an investigation into the applicant's official records and verify thereby the applicant's character and rep-

utation, and shall in addition verify for accuracy the information contained in the application, and shall forward this information together with his recommendation for approval or disapproval and one [1] set of legible and classifiable fingerprints of the applicant to the superintendent *who may make whatever further investigation he deems necessary . . . If it appears to the superintendent that the applicant has a proper reason for carrying a handgun and is of good character and reputation and a proper person to be so licensed, he shall issue to the applicant either a qualified or an unlimited license to carry any handgun or handguns lawfully possessed by the applicant. . ."* (Emphasis added.).

In *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334, our Supreme Court analyzed the then existing and virtually identical[1] version of the above statutory scheme in rejecting a claim that the substance thereof constituted an unconstitutional delegation of power. The Court stated:

"Whether the applicant 'has a proper reason for carrying a pistol and is of good character and reputation and a suitable person to be so licensed' are questions of fact; and the Legislature may delegate the function of determining these facts upon which the execution of the legislative policy, as expressed in the Act, is dependent . . .

\* \* \* \* \* \*

"It is our opinion that the Superintendent of State Police, with his special training and experience, and with the facilities which he has at his command for securing information, is capable and qualified to determine whether an applicant for a license to carry a pistol has a 'proper reason' therefor, and whether he is a 'suitable person' to have a pistol in his possession at will. The Legislature could

1. In 1973, the legislature replaced the phrase "suitable person" with "proper person." The phrase "proper reason" remained unchanged. Acts 1973, P.L. 333, § 5, p. 1822.

2. Simply stated, the Majority's declaration of unconstitutionality is *overly broad.* As explained in the text, the Superintendent has the

not determine these facts in each individual case, and unless such ministerial duties are delegated to some competent person, with authority to execute the will of the Legislature upon proper showing of facts, such laws would become a nullity because of a lack of machinery for their enforcement.

"When the statute here in question provides that the Superintendent of State Police *shall* issue to the applicant a license, if it appears that he is of good character and reputation and a suitable person, it requires that such Superintendent must determine whether or not the applicant meets these qualifications and if, in the opinion of the Superintendent the conditions of the statute are met, he has no discretion in the matter but must issue the license.

"For the reasons above stated, we find no unlawful delegation of legislative power in the statute here in question and it does not violate the Due Process Clause of the 14th Amendment of the United States Constitution or Art. 4, § 1, of the Indiana Constitution." (Citations and footnotes omitted.).

237 Ind. at 684–85, 148 N.E.2d at 337. The Court thus determined that pursuant to IC 1971, 35–23–4.1–5, *supra,* whether an applicant has a "proper reason" is a question of fact. In turn, the Court approved the legislature's directive that the power to evaluate the factual basis for a stated reason rests with the State Police Superintendent. The Superintendent's peculiar expertise in the area, the Court reasoned, justified the delegation of fact finding power.

The Majority concludes that a Superintendent's capacity to evaluate whether an applicant in fact needs to defend himself "contravenes the essential nature of the constitutional guarantee."[2] In *Matthews v. State, supra,* the Supreme Court expressly rejected this very proposition of law.

power to evaluate the factual basis for an applicant's stated need for self-defense. *Matthews v. State, supra.* When a factual basis exists, of course, the Superintendent cannot deny the license on the basis that self-defense is not a proper reason. Notwithstanding the Majority's overbroad statement, these rules remain the

Writing for the Majority, Chief Justice Bobbitt stated unequivocally:

> "Appellant further asserts that the Firearms Act violates Art. 1, § 32 of the Indiana Constitution which provides that 'The people shall have a right to bear arms, for the defense of themselves and the State,' because it restricts the right of the people to bear arms for their own defense.
>
> \* \* \* \* \* \*
>
> "The Legislature has the power, in the interest of public safety and welfare, to provide reasonable regulations for the use of firearms which may be readily concealed, such as pistols . . ."
>
> \* \* \* \* \* \*
>
> "The provisions of § 10–4736, supra, do not restrict nor prohibit appellant or any other person from having a pistol in his home or 'fixed place of business' for the defense of himself and the State. Neither does such Act attempt to restrict or prohibit the use of firearms other than pistols, as they are defined in § 1 of the Act.
>
> "Article 1, § 32, supra, does not say that the people shall have a right to bear pistols, or any other specific kind or type of arms.
>
> "Since, under the Act here under consideration, people may carry pistols in their homes and fixed places of business, without a license, and other kinds and types of firearms any place, we are unable to see wherein it contravenes any of the provisions of Art. 1, § 32 of the Indiana Constitution." (Citations and footnotes omitted.).

237 Ind. at 685–687, 148 N.E.2d at 337–38. The Court thus rejected the very proposition of law that the Majority has tendered here today: that the Superintendent's capacity to evaluate the factual basis for an applicant's stated need of self-defense violates Article 1, Section 32 of the Indiana Constitution.

Of course, in view of our highest Court's holding in *Matthews*, the Majority's state-

ment of law has no value as precedent. If it did, however, the State Police Superintendent would be compelled to grant licenses to carry handguns to any "proper" person who simply alleged a need for self-defense. I suggest that "proper" persons are many; on the other hand, those with a genuine need to carry a handgun on their persons outside their home or business may be very few. If an *alleged* need for self-defense was all that was necessary, most of our citizens would qualify for the license; the Superintendent could not—except upon proof of mental incompetency or previous criminal acts—deny an application. For all practical purposes, the upshot of the Majority's approach, were it given effect, would be the de-regulation of handguns.

The power of the legislature to impose the limitations which the Majority has here attempted to void derives from its prerogative to protect the public safety and welfare. *Matthews v. State, supra.* In *Matthews*, the Court justified the limitations-at-issue on the basis of their narrow scope and positive effect on the public's safety. The Court emphasized that only one type of firearm—the "readily concealed" handgun—was within the restricted category, and that the licensing requirement was necessary only to carry a handgun in public, not in the home or fixed place of business. The legislation was thus a reasonable limitation on the citizenry's right to bear arms. As the Court explained, the restrictions served the public safety and welfare:

> "The purpose of the Firearms Act is to achieve a maximum degree of control over criminal and careless uses of certain types of firearms, while at the same time making them available to persons where needed for protection." (Footnote omitted.).

In the passage of time since the original enactment of IC 1971, 35–23–4.1–5, *supra*, and the Court's holding in *Matthews*, numerous studies have confirmed that handgun restrictions promote the public safety and welfare.[3] For instance, in their Staff

---

law today. *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334.

**3.** *See, e. g.,* Final Report, *National Commission on the Causes and Prevention of Violence*

Report to the National Commission on the Causes and Prevention of Violence, Messrs. Newton and Zimring concluded that "no data exist which would establish the value of firearms as a defense against attack on the street;" rather, their empirical research led them to conclude that "the ready accessibility of guns contributes significantly to the number of unpremeditated homicides and to the seriousness of many assaults." G. Newton and F. Zimring, *Firearms and Violence in American Life*, p. 62–67 [*Staff Report to the National Commission on the Causes and Prevention of Violence, No. 7 1969*]. In response to the Staff Report, the National Commission recommended that "determinations of need [to own a handgun] be limited to police officers and security guards, small businessmen in high crime areas, and others with a special ·need for self-protection." Final Report, *National Commission on the Causes and Prevention of Violence* p. 181 (1969). These findings underscore the Supreme Court's decision in *Matthews* that public safety and welfare considerations justify statutory limitations on the right to carry a handgun in public. In short, the right to bear arms is not absolute, as the Majority apparently feels.

If, as the Majority has suggested, any suitable person could obtain a license to carry a handgun in public merely by alleging a need for self-defense, the purposes of the statute would not be served; rather, concealed handgun crimes would run rampant. Therefore, notwithstanding the Majority's opinion here today, the State Police Superintendent has both the power and duty to evaluate the factual basis for an applicant's stated need for self-defense. *Matthews v. State, supra.*

After the Superintendent has made a factual determination as to a proper need to carry a handgun in public, a judicial review of his factual determination is governed by the provisions of the Administrative Adjudication Act: IC 1971, 4–22–1–1 *et seq.*, Ind.Ann.Stat. § 63–3001 *et seq.* (Burns Code

Ed.); *State ex rel. Sacks Bros. Loan Co. v. DeBard* (1978), Ind.App., 381 N.E.2d 119. Pursuant to IC 1971, 4–22–1–18, Ind.Ann. Stat. § 63–3018 (Burns Code Ed.), we cannot reverse the determination of the Superintendent unless it is not supported by substantial evidence. In our assessment of the evidence, we cannot substitute our personal judgment for that of the Superintendent. *Department of Financial Inst. v. State Bank of Lizton* (1969), 253 Ind. 172, 252 N.E.2d 248, 250–51. As the Supreme Court stated in *State Bank of Lizton* :

> " ' *  *  *  We, as judges, are subjected to the same natural desires and to the same weaknesses that all men have to substitute our personal judgment for that of others, and we must guard against such inclinations. Where the legislature has created a fact-finding body of experts in another branch of the government, their decision or findings should not be lightly overriden and set aside because we, as judges might reach a contrary opinion on the same evidence. So long as the experts act within the limits of the discretion given them by the statute, their decision is final. *  *  * ' "

253 Ind. at 177–78, 252 N.E.2d at 251.

Here, the Majority has summarily concluded that the evidence which indicated that Schubert needed to defend himself "stood unrefuted."

Schubert testified that his brother fired a shot at him while Schubert was photographing his mother's house for the United States Treasury Department. The shooting incident occurred in September of 1974. Schubert did not file his application for a license to carry a handgun in public until June of 1975. This lapse of nine months seriously undermines the validity of Schubert's "need" to defend himself. Furthermore, while it is true that Schubert received threatening mail in April of 1975, *at no time did Schubert inform local law enforcement officials of the shooting incident or*

---

(1969); G. Newton and F. Zimring, *Firearms and Violence in American Life* p. 62–67 [Staff Report *to the National Commission on the Causes and Prevention of Violence No. 7, 1969*]; Mosk, *Gun Control Legislation: Valid*

*and Necessary*, 14 N.Y.L.Forum 694 (1968); Geisel, The *Effectiveness of State and Local Regulation of Handguns: A Statistical Analysis*, Duke L.J. 647 (1969).

the subsequent threats received by mail. Furthermore, Schubert failed to explain why he had never attempted to contact his brother, whom he regarded as the source of his fears, in an effort to reach an amicable resolution of their differences. Collectively, these circumstances justify the conclusion that Schubert's perceived need for a license to carry a handgun in public was more psychological than real; Superintendent DeBard was justified in denying Schubert's application.

I note that the Majority has decried the subjectivity involved in the determination of the question whether an applicant in fact needs to defend himself. It is beyond dispute that the Superintendent, *as is the case with all fact finders*, must exercise his subjective analytical abilities in processing handgun applications. In the subject area before us, the Superintendent is the person best suited to invoke any subjectivity necessary to resolve whether an applicant qualifies to carry a handgun in public. *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334, 337–38. The Superintendent is trained to recognize patterns of violence, just as he is well-versed in the dangers inherent to handguns. His expertise, gained from his experience and training should be respected and not "lightly overridden" by this Court, which lacks any significant degree of expertise in the subject matter at hand. *Department of Financial Inst. v. State Bank of Lizton, supra.* Here, unfortunately, the Majority has supplanted its personal and *equally subjective* evaluation of the facts for that of the Superintendent, who is far more qualified to decide the question before us.

I dissent.