UNITED BEVERAGE COMPANY OF SOUTH BEND, INC., and National Beer Wholesalers Association, Inc., Plaintiffs,

v.

INDIANA ALCOHOLIC BEVERAGE COMMISSION, Harry K. Wick, N. Kay Wood, James Courtney and Adolphus Vandeveer, Defendants.

No. S 82–476.

United States District Court, N.D. Indiana, South Bend Division.

June 21, 1983.

George Herendeen, South Bend, Ind., Howard L. Bernstein, Mitchell Gerson, Washington, D.C., for plaintiffs.

Linley E. Pearson, Atty. Gen. of Ind., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

### I.

Subject matter jurisdiction here is alleged to be federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4). The original complaint in this case was filed on the 20th day of October, 1982. An amended complaint was filed on November 12, 1982 which continued to assert claims under 42 U.S.C. §§ 1981 and 1983 and request relief under 28 U.S.C. §§ 2201 and 2202. (Since there is no possible arguable basis for these plaintiffs to be eligible for any relief under 42 U.S.C. § 1981, the claims based on that section were denied in open court on January 28, 1983). The amended complaint continues to assert that Rule 28 of the Indiana Alcoholic Beverage Commission is violative of both the Due Process and Equal Protection Clauses of the Fourteenth Amendment [1] of the Constitution of the United States, as well as Article I, § 10, Clause 1.[2] It also asserts that Rule 28 is violative of the Due Process and Equal Protection Clauses of the Constitution of the State of Indiana [3] and is also violative of Article IV, § 1 thereof.[4]

On February 7, 1983 the plaintiffs filed a Motion for Summary Judgment with elaborate attachments, affidavits and briefs. On April 28, 1983, the defendants filed a Motion for Summary Judgment. Hearing and oral argument on cross-motions for summary judgment was held in open court on the 13th day of May, 1983, and the parties were given until the 6th day of June, 1983 to file any and all supplemental briefs, which has now been done. The cross-motions for summary judgment are now ripe for ruling.

The parties have been given precise deadlines for filing final briefs and have com-

---

1. Citizenship—Due process of law—Equal protection.—All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

2. Powers denied the states.—[1] No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money, emit bills of credit; make any thing but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility.

3. Courts open—Due course of law—Administration of justice.—All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

4. The general assembly.—The Legislative authority of the State shall be vested in the General Assembly, which shall consist of a Senate and a House of Representatives. The style of every law shall be: "Be it enacted by the General Assembly of the State of Indiana"; and no law shall be enacted, except by bill.

plied with same. See *Indiana Port Commission v. Bethlehem Steel Corp.,* 702 F.2d 107 (7th Cir.1983).

## II.

The subject of this action, Rule 28 of the Indiana Alcoholic Beverage Commission, was duly promulgated and became effective on March 16, 1979. The rule provides:

It shall be unlawful for any person engaged in business as a distiller, brewer, rectifier, vintner, or other producer, importer, or as a wholesaler of liquor, wine, beer or malt beverages, directly or indirectly, or through an affiliate to:

(1) Exclusive Outlet—Require by agreement or otherwise any permittee authorized to purchase alcoholic beverages from him to purchase any such products from him to the exclusion in whole or in part, of liquor, wine, beer or malt beverages sold or offered for sale by other persons.

(2) "Tying" Alcoholic Beverages—Induce any permittee engaged in the sale of liquor, wine, beer or malt beverages to purchase any such products from such person to the exclusion, in whole or in part, of liquor, wine, beer or malt beverages sold or offered for sale by other persons by requiring the purchaser to take and dispose of a certain quantity or quota of such products.

(3) Product Distribution—Restrict by agreement or otherwise, the sale or resale of liquor, wine, beer or malt beverages to a given geographical area or to permittees, who are otherwise entitled to buy, within a given geographical area. This section shall not be deemed to prohibit the designation of an "area of primary responsibility", however, efforts to restrict sales to only the designated area of primary responsibility are deemed to be prohibited.

Plaintiffs' attack on Rule 28 is directed toward subsection 3 of the rule, which section prohibits the restriction of geographic areas and customers in agreements between and among brewers and wholesalers.

The issue of exclusive territories for Indiana beer wholesalers has been the focus of a great deal of legislation and litigation since the passage of the Twenty-first Amendment in 1933. Indiana's original alcoholic beverage act was enacted in 1933. The act did not create an alcoholic beverage commission, but rather an "excise director" charged with administering the act. The number of beer wholesalers was limited by quota and the excise director had absolute discretion in the issuance and revocation of the permits. (1933 Ind.Acts, Ch. 80, Sec. 6, p. 492). Under the original act, a beer wholesaler was prohibited from selling his products outside a territory consisting of his own county and the surrounding counties. (*Id.,* Section 8(a), p. 499). In 1935 the Indiana Alcoholic Beverage Commission was created. (1935 Ind.Acts, Ch. 226, Sec. 5, p. 1064). Again, under the 1935 Act, beer wholesalers were granted specific geographic territories. (*Id.,* Sec. 9, p. 1090).

In 1939 the state legislature discarded the existing quota system, along with geographic territories, and removed the Commission's discretion to deny a license to a qualified applicant. (1939 Ind.Acts, Ch. 29, Sec. 2, p. 86). Eventually, franchise relationships developed between brewers and wholesalers. These agreements typically gave wholesalers the exclusive right to sell the brewer's products within a certain geographic territory, usually a county. In 1965, a quota system for beer wholesalers was reinstated. (1965 Ind.Acts, Ch. 258, Sec. 1, p. 639).

In 1967, the Supreme Court of the United States decided *United States v. Arnold Schwinn and Company,* 388 U.S. 365, 87 S.Ct. 1856, 1865, 18 L.Ed.2d 1249 (1967), holding that any restriction imposed by a manufacturer on the customers or geographic territories of its dealers and distributors was *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. This decision rendered void any exclusive franchise relationships entered into by beer wholesalers in Indiana.

Wholesalers were then free to enter into open competition with each other. Wheth-

er there actually was any competition between Indiana beer wholesalers in the period following the *Schwinn* decision is the subject of two related lawsuits currently pending before this court in Lafayette, Indiana. In those actions, *Arth Main Street Drugs, Inc., et al. v. Beer Distributors of Indiana, Inc., et al.,* No. F 77–73 (N.D.Ind., filed July 13, 1977); and *Tippecanoe Beverage, Inc. v. Beer Distributors of Indiana, Inc., et al.,* No. F 77–72 (N.D.Ind., filed July 13, 1977), several retail liquor stores allege that existing beer wholesalers acted pursuant to a "gentlemen's agreement" whereby each wholesaler restricted his sales to retailers and dealers located within his particular county of operation. (Those cases are set for trial before Judge Michael S. Kanne this summer.)

In or around 1974 certain wholesalers began to offer price discounts to retailers who purchased beer from the wholesalers' docks. These retailers would use their own trucks to pick up beer directly from the wholesaler's dock. As a result, wholesaler who did not practice "dockselling" noticed declining sales.

Three years later, in the case of *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) the Supreme Court overruled the *per se* rule of *Schwinn* with respect to vertical territorial restraints and reverted to the rule of reason standard of *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) and *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Under the rule of reason, the court must ascertain the facts peculiar to the particular business in making its determination regarding the legality of the challenged conduct. Justice Brandeis described the standard as follows:

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To

determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)

In *GTE Sylvania,* the Court noted that, as a general rule, vertical restrictions reduce intrabrand competition while promoting interbrand competition. The court declined to hold that such restrictions generally have a pernicious effect on competition or that they lack any redeeming virtue. However, the Court specifically left open the possibility that "particular applications of vertical restrictions might justify *per se* prohibition under *Northern Pac. R. Co.*" 433 U.S. at 58, 97 S.Ct. at 2561.

Shortly after the Supreme Court's decision in *GTE Sylvania,* the Indiana Alcoholic Beverage Commission promulgated Rule 28. In order to understand the significance of Rule 28, some of its legislative background must be understood.

The advent of retail hauling and transshipping brought about efforts within the Indiana General Assembly to change the law to provide for exclusive territories for beer wholesalers. The first of these proposals sought to establish geographic territories for all Indiana beer wholesalers, regardless of the terms of their franchise agreements. Legislation in this vein was first introduced in 1974 and again in 1975 (Senate Bill 257 and House Bill 2000, respectively). During the period from 1976 through 1978, legislative efforts in the area were confined to unsuccessful efforts to

prohibit retail hauling (House Bill 1241 in 1976 and House Bill 1200 in 1978). Another bill seeking to impose territorial restrictions on wholesalers was introduced and defeated in 1979 (House Bill 1973).

In 1981, following the promulgation of Rule 28 by the ABC, yet another bill attempting to impose geographic territories on beer wholesalers was voted down by the Indiana General Assembly. (House Bill 1991). In 1982, the Commission held a hearing at which it considered repealing Rule 28. The Commission voted 4–0 against repeal:

Chairman Skinner asked if all Commission members had ample opportunity to review both the oral and written testimony and consider all the issues with regard to Rule 28. All Commission members answered yes.

Chairman Skinner moved that the Commission take no further action with regard to the repeal of Rule 28 for the following three reasons:

First, a ban on exclusive territories is consistent with Orr Administration's basic commitment to free enterprise, competitive markets, and lower consumer prices.

Second, the retention, of Rule 28 is consistent with the wishes of the General Assembly which has consistently and specifically declined to establish territories through Beer Baron legislation.

And third, the current regulation is in the best interest of the consuming public. Motion seconded by Commissioner Courtney and unanimously approved. (Chairman polled the Commission members individually.)

Excerpt from Alcoholic Beverage Commission Minutes, 4/21/82.

In 1983, yet another approach was attempted by the proponents of exclusive territories. In the Indiana Senate, an amendment was attached to House Bill No. 1690, which amendment provided in pertinent part:

b) The commission may not:

(1) prohibit a seller of alcoholic beverages from restricting; or

(2) require a settler of alcoholic beverages to restrict;

the resale of the alcoholic beverages to certain persons or within a certain geographical area.

This bill would have effectively repealed Rule 28 and allowed brewers and wholesalers to enter into exclusive territory agreements subject only to the GTE Sylvania rule of reason. The bill was passed by the Indiana State Senate and returned to the Indiana House of Representatives where it had previously passed without the amendment. The House of Representatives did not concur, and the amendment did not pass. The contents of Rule 28 must have been known to the Indiana General Assembly.

III.

Any state law regulating alcoholic beverages must be considered in light of the Twenty-first Amendment to the Constitution of the United States. The Amendment provides in relevant part:

§ 1 The eighteen article of amendment to the Constitution of the United States is hereby repealed.

§ 2 The transportation or importation into any State, Territory, or Possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

The Amendment thus gives the states the broad power to restrict, ban, or otherwise regulate the importation and intrastate traffic in alcoholic beverages. In at least one case, the Supreme Court of the United States has held that the powers granted to the states by the Twenty-first Amendment exceed the state's general police powers.

While the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power, the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than

the normal state authority over public health, welfare, and morals.

*California v. LaRue,* 409 U.S. 109, 114, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972)

Relying on this language, this Court has held that "while all legislation is presumed to be valid, legislation which deals with a subject matter which is specifically delegated to the states under the Twenty-first Amendment must be given greater deference." *Coolman v. Robinson,* 452 F.Supp. 1324 (N.D.Ind.1978)

The sweep of the Twenty-first Amendment was well illustrated in an early opinion by Justice Brandeis speaking for a unanimous Supreme Court in *Indianapolis Brewing Co. v. Liquor Control Commission,* 305 U.S. 391 (1939), at page 394, 59 S.Ct. 254, at page 255, 83 L.Ed. 243:

> The plaintiff contends that although the Twenty-first Amendment declares:
>
> "The transportation or importation into any State, Territory or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited"
>
> the Michigan law should be held void as violating the commerce clause and the due process and equal protection clauses of the Fourteenth Amendment. It characterizes the law as "retaliatory"; argues, among other things, that the Amendment may not be interpreted as permitting retaliation; and insists that such interpretation would defeat its purpose, as thereby Michigan would be allowed to punish Indiana for doing what, under the rule applied in *State Board of Equalization v. Young's Market Co.,* 299 U.S. 59, 63 [57 S.Ct. 77, 78, 81 L.Ed. 38], is permitted. Whether the Michigan law should not more properly be described as a protective measure, we have no occasion to consider. For whatever its character, the law is valid. Since the Twenty-first Amendment, as held in the *Young* case, the right of a state to prohibit or regulate the importation of intoxicating liquor is not limited by the commerce clause; and, as held by that case and *Mahoney v. Joseph Triner Corp.,* 304 U.S.

401 [58 S.Ct. 952, 82 L.Ed. 1424], discrimination between domestic and imported intoxicating liquors, or between imported intoxicating liquors, is not prohibited by the equal protection clause. The further claim that the law violates the due process clause is also unfounded. The substantive power of the State to prevent the sale of intoxicating liquor is undoubted. *Mugler v. Kansas,* 123 U.S. 623 [8 S.Ct. 273, 31 L.Ed. 205].

See also, *Mahoney v. Triner Corp.,* 304 U.S. 401, 58 S.Ct. 952, 82 L.Ed. 1424 (1938), and *Finch & Co. v. McKittrick,* 305 U.S. 395, 59 S.Ct. 256, 83 L.Ed. 246 (1939). In the *State Board of Equalization v. Youngs Market,* 299 U.S. 59, 63–64, 57 S.Ct. 77, 78–79, 81 L.Ed. 38 (1936), the court succinctly stated that a "classification recognized by the Twenty-first Amendment cannot be deemed forbidden by the Fourteenth."

Plaintiffs are asking this court to decide an issue which is properly the subject of the state's police powers and the extra powers granted under the Twenty-first Amendment. This court should and will exercise the greatest restraint in passing judgment on highly volatile social, economic and political issues that should properly be decided by the Indiana General Assembly.

### IV.

In their first amended complaint plaintiffs allege that the promulgation of Rule 28 by the Alcoholic Beverage Commission is defective in several respects. Count III alleges that Rule 28 is void as an "unlawful usurpation of legislative power" by an agency. In Count IV, plaintiffs ask this court to rule that the Alcoholic Beverage Commission exceeded its power and authority in promulgating Rule 28. Finally, assuming that the Indiana General Assembly has delegated to the Alcoholic Beverage Commission the power to promulgate Rule 28, plaintiffs allege in Count V that the delegation of such power is unlawful for lack of sufficient standards.

### A.

The delegation issue must be examined on at least two levels here, i.e., it must

be examined under both federal and state constitutional standards. The primary subject matter jurisdiction of this court under 28 U.S.C. § 1331 requires federal examination. The pendent claims for relief under Indiana state law permits the latter. For reasons stated here the plaintiffs are entitled to relief under neither argument.

Even assuming the full blown validity and application of *A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), it is most difficult to apply its teaching to this state liquor administrative regulation. This court is unable to find authority, and none has been cited, in which this type of state legislative delegation has been held to violate the Constitution of the United States. There is no authority that *Schechter* establishes a federal constitutional standard by which state administrative regulations must be examined. This court must here decline so to apply it.

In two cases immediately following the *Schechter* case the Supreme Court followed a more expansive view regarding the standards under which Congress may delegate legislative power. See *United States v. Rock Royal Cooperative, Inc.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939), and *H.P. Hood & Sons v. United States*, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478 (1939). The Supreme Court upheld the Agricultural Agreement Act of 1937 against the charge, *inter alia*, that it invalidly delegated legislative power to the Secretary of Agriculture. The cases involve the Secretary's acts under the statute regulating the marketing of milk in the metropolitan areas of New York and Boston. The broad powers given to the Secretary were established only by the following declaration of policy set out in the Act:

> To establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the pur-

chasing power of agricultural commodities in the base period [1909–1914].

To effectuate this policy the Secretary was authorized to enter into marketing agreements with producers and handlers of agricultural products to establish uniform prices to be paid by handlers of milk to producers, to set up equalization pools to stabilize prices paid by producers. A majority of the Supreme Court held that the basic policy of restoring "parity prices" was a definite enough guide to the Secretary's discretion to meet the charge of invalidation delegation. (It may be worthy of some note that Chief Justice Hughes, author of *Schechter*, joined in the dissent of Justice Roberts in *Rock Royal* but concurred with the majority in *Hood*.)

Two years later the Fair Labor Standards Act of 1938 was attacked, *inter alia*, on the ground that it invalidated legislative power. See *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). That Act provided for a minimum wage rate "not in excess of 40¢ an hour" but the precise rate for each industry was to be set by an administrator upon the advice of industry committees which were to recommend rates which "will not substantially curtail employment" and "will not give a competitive advantage to any group in the industry." The administrator was also to consider "other relevant factors" set out in some detail. In *Opp Cotton Mills, Inc. v. Administrator*, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624 (1941), the Supreme Court held the delegation valid and stated that "where, as in the present case, the standards set up for the guidance of the administrative agency, the procedure which it is directed to follow and the record of its action which is required by the statute to be kept or which, in fact, preserved, are such that Congress, the courts and the public can ascertain whether the agency has conformed to the standards which Congress has prescribed, there is no failure of performance of the legislative function." *Id.*, at 144, 61 S.Ct. at 532.

In another case the Emergency Price Control Act of 1942 conferred broad powers upon the Office of Price Administration. It

stated in detail the purposes of the act and directed the OPA to fix prices that would tend to achieve these purposes and which would be "fair and equitable." Also it was ordered "so far as practicable" to "give due consideration to the prices prevailing between October 1 and October 15, 1941." In *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), the Supreme Court held that that act did not invalidly delegate legislative power to the Office of Price Administration.

Three years later, in *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1947), the Supreme Court held valid the broad delegation provisions of the War Contracts Renegotiation Act of 1942. The Renegotiation Act authorized the heads of the various services to renegotiate initial contracts on the basis of experience in order to prevent "excess profits". Furthermore, it was authorized to recover from contractors "excess profits" which had been made. Although the Act did not define "excess profits" the Supreme Court held that in view of the background and purposes of the act and the fact that it was an exercise of war powers the term was not so vague a standard as to result in a delegation by Congress of its own legislative power. The Court also held that the War Department had developed a detailed set of administrative practices under the act and that Congress, in amending the act without altering these practices had given approval to them. The fact that the standard of conduct set out in the statute had produced the kind of practices Congress desired showed that the standard was not too vague.

These later cases have removed the hard edges of *Schechter* and it is a historical fact that no Act of Congress has since been invalidated on the basis of a *Schechter* rationale since 1936. This result is well illustrated by the statement of Professor Kenneth Culp Davis:

Lawyers who try to win cases by arguing that congressional delegations are unconstitutional almost invariably do more harm than good to their clients' interests. Unrealistic verbiage in some of the older judicial opinions should not now be taken seriously. The effective law is in accord with a 1940 statement of the Supreme Court: "Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility." [*Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 398, 60 S.Ct. 907, 914, 84 L.Ed. 1263 (1940).] Much of the judicial talk about requirement of standards is contrary to the action of the Supreme Court takes when delegations are made without standards. The vaguest of standards are held adequate, and various delegations without standards have been upheld....

In only two cases in all American history have congressional delegations to public authorities been held invalid. Neither delegation was to a regularly constituted administrative agency which followed an established procedure designed to afford the customary safeguards to affected parties. The Panama case [*Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935)] was influenced by exceptional executive disorganization and in absence of such a special factor would not be followed today. The Schechter case [*Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)] involved excessive delegation of the kind that Congress is not likely again to make....

In absence of palpable abuse or true congressional abdication, the non-delegation doctrine to which the Supreme Court has in the past often paid lip service is without practical force. 1 K. Davis, Administrative Law Treatise § 2.01 (1958) (footnotes omitted).

Two cases cited by the plaintiffs, *National Cable Television Assn v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), and *Federal Power Commission v. New England Power Co.,* 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974), are not based on *Schechter* principles. Justice Douglas, speaking for the majority, stated: "Whether the present act meets the requirement of *Schechter* and *Hampton* [*Hampton & Co. v. U.S.* 276 U.S. 394, 48

S.Ct. 348, 72 L.Ed. 624] is a question we do not reach." The result reached in those two 1974 cases was, however, entirely at odds with the result reach in *Schechter.* Those 1974 cases are not at all supportive of the plaintiffs' position here.

### B.

■ The question under the Constitution of the State of Indiana on delegation is slightly closer. This court has some doubt as to whether it ought to reach this question at all on a pendant state claim in a case filed under 28 U.S.C. § 1331. There is no possible basis for jurisdiction here under 28 U.S.C. § 1332.

In regard to delegation of authority to administrative bodies, the Supreme Court of Indiana in *Taxpayers Lobby of Indiana, Inc. v. Orr,* 262 Ind. 92, 311 N.E.2d 814, 819 (1974) stated:

The only limitation on the delegation of authority to administrative bodies is that reasonable standards must be established to guide the administrative body. The standards, however, only need to be specific as the circumstances permit, considering the purpose to be accomplished by the statute. *Orbison v. Welsh, Governor et al.* (1962), 242 Ind. 385, 179 N.E.2d 727; *Wampler v. Trustees of Indiana University* (1961), 241 Ind. 449, 172 N.E.2d 67.

In this same vein the Court of Appeals of Indiana, speaking through Chief Judge Buchanan, in *Indiana Alcoholic Beverage Comm. v. McShane,* 170 Ind.App. 586, 354 N.E.2d 259 (1976), stated:

It is our opinion that the issuance of the injunction by the trial court mandating the ABC to enforce its present rules and regulations is an unwarranted excursion into the executive branch of government.

■ Innumerable decisions in this State have recognized that administrative functions can be validly delegated by the Legislature to administrative agencies if sufficient standards are imposed to guide the agency in exercising its statutory authority.

*See Baldwin v. Inter City Contractors, Inc.* (1973), Ind.App., 297 N.E.2d 831; *Alanel Corp. v. Indianapolis Redevelopment Comm.* (1958), 239 Ind. 35, 154 N.E.2d 515; *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334; *Schakel v. Review Bd. of Ind. Emp. Sec. Div.* (1968), 142 Ind.App. 475, 235 N.E.2d 497; *Gross Income Tax Div. v. Colpaert Realty Corp.* (1952), 231 Ind. 463, 109 N.E.2d 415; *State ex rel. Standard Oil Co. v. Review Bd.* (1951), 230 Ind. 1, 101 N.E.2d 60; *Dept. of Financial Inst. v. Johnson Chev. Co.* (1950), 228 Ind. 397, 92 N.E.2d 714; *Benton County Council v. State ex rel. Sparks* (1946), 224 Ind. 114, 65 N.E.2d 116; *Kryder v. State* (1938), 214 Ind. 419, 15 N.E.2d 386; *Carroll Perfumers, Inc. v. State* (1937), 212 Ind. 455, 7 N.E.2d 970; *Albert v. Milk Control Board of Indiana* (1936), 210 Ind. 283, 200 N.E. 688.

■ The ABC is the recipient of such delegation. *See* IC § 7.1–2–1–1 et seq. It has broad powers both express and implied, to regulate and limit the possession, sale and use of alcoholic beverages, including the power to issue and revoke alcoholic beverage permits (*see* IC § 7.1–2–3–9), the power to "promulgate [and depromulgate] rules and regulations" governing the alcoholic beverage industry (*see* IC §§ 7.1–2–3–7, –6, –16) and the power to enforce and administer the provisions of Title 7.1 and the rules and regulations of the ABC (*see* IC § 7.1–2–3–2). It also has express statutory authority in IC § 7.1–2–3–8

. . . to conform, to adapt, or to coordinate, to the extent the commission deems proper the practices, methods, standards, and rules and regulations governing the traffic in alcohol and alcoholic beverages, with the practices, methods, standards and rules and regulations established by an officer or agency of the United States government.

■ In accordance with its statutory authority (*per* IC § 7.1–2–3–6 and §§ 4–22–2–4, –5, –6) to revoke rules and regulations adopted by it, the ABC scheduled

a public hearing for the presentation of facts, views, and comments of interested parties relating to proposed revocation of the rules and regulations in question. By statute (IC § 4–22–2–4) the ABC is required at such a hearing to give "full consideration" to "all relevant matter presented."

█ Before it could do so, the ABC was presented with an injunction mandating it, in effect, to enforce its present rules and regulations preventing price advertising and quantity discounts until such time as it had specific authority from the Legislature to allow price advertising and quantity discounts. Differently stated, the ABC was prohibited from exercising its statutory discretion to revoke or not revoke its rules and regulations within its statutory authority (IC §§ 7.1–2–3–7, –6, –16) without having taken final action.

Such an intrusion into the affairs of this administrative agency by the trial court is unlawful for three reasons:

I. The parties-plaintiff in this action did not have standing to maintain the action.

II. The action was brought prematurely.

III. The action violated the fundamental principle of separation of powers.

*Third,* issuance of the trial court's injunction violated the venerable separation of powers clause—Article III, § 1 of the Indiana Constitution.

█ Indiana, like other jurisdictions, recognizes the need for unfettered action by administrative agencies operating within the sphere of their authority. A court may not attempt to control an agency's valid exercise of its discretionary powers or to substitute its judgment for that of the agency in matters within the realm of the agency's delegated authority. In *Uhlir v. Ritz* (1970), 255 Ind. 342, 264 N.E.2d 312, Justice Hunter describes the limited review power exercised by the courts:

To assure that the administrative process does not exceed the bounds of justice the courts have been required to

exercise a certain review power. But, because we must be ever aware that *we operate within a tri-partite system of government, courts must carefully police the scope of their review* so that they do not intrude into the area of valid administrative discretion.... We may make such a ruling [that an administrative act was capricious, arbitrary, an abuse of discretion, in excess of statutory authority or unsupported by substantial evidence] if the facts of a case warrant it *but we may not interfere with acts by an administrative body which are within the allowable scope of responsible discretion.*

255 Ind. at 344, 345, 264 N.E.2d at 313 (citations omitted). (Emphasis added.)

The tendency exists in a government divided into three branches for one branch to encroach on another. James Madison in The Federalist describes power as being "of an encroaching nature." (footnotes omitted)

█ It is therefore clear under Indiana state law that the Indiana General Assembly can validly delegate discretionary functions to administrative agencies if sufficient standards are imposed to guide the agency in the exercise of its statutory authority. *Indiana Alcoholic Beverage Commission v. McShane,* 170 Ind.App. 586, 354 N.E.2d 259 (1976); *Taxpayers Lobby of Indiana, Inc. v. Orr,* 262 Ind. 92, 311 N.E.2d 814 (1974). Moreover, the standards need only be as specific as the circumstances permit, considering the purpose of the statute. *Taxpayers Lobby of Indiana, Inc. v. Orr, supra.*

In Title 7.1 of the Indiana Code, the Indiana General Assembly has delegated many of its administrative functions to the Alcoholic Beverage Commission:

(The ABC) has broad powers, both express and implied, to regulate and limit the possession, sale and use of alcoholic beverages, including the power to issue and revoke alcoholic beverage permits. (*See,* IC 7.1–2–3–9), *the power to "promulgate [and depromulgate] rules and regulations" governing the alcoholic beverage industry (See, IC §§ 7.1–2–3–7,*

*–6, –16)* and the power to enforce and administer the provisions of Title 7.1 and the rules and regulations of the ABC (*See* IC § 7.1–2–3–2).

*Indiana Alcoholic Beverage Commission v. McShane, supra,* 170 Ind.App. at 594–595, 354 N.E.2d at 265. (Emphasis supplied).

As the Indiana Court of Appeals noted in *McShane,* the Commission's power to promulgate rules and regulations is contained in IC 7.1–2–3–7 and IC 7.1–2–3–8. The general rulemaking power of the Alcoholic Beverage Commission is contained in IC 7.1–2–3–7, which reads as follows:

The commission shall have the power to promulgate rules and regulations governing:

(a) The conduct of the meetings and business of the commission;

(b) The conduct of hearings before any of the commission's representatives;

(c) The conduct of the business of a permittee authorized or governed by the provisions of this title;

(d) The enforcement of the provisions of this title and of the rules and regulations of the commission;

(e) The standards of purity and methods of manufacturing used in the production of alcohol and alcoholic beverages;

(f) The prevention or misbranding or adulteration of alcohol or alcoholic beverages; and

(g) The prevention of fraud, evasion, trickery, or deceit in the manufacture, labeling, importation, advertisement, transportation, or sale of alcohol or alcoholic beverages, or the evasion of other laws of Indiana relating to alcohol or alcoholic beverages.

Additionally, in IC 7.1–2–3–8 the Commission is granted the authority to conform its rules to the alcoholic beverage laws of the federal government:

The commission shall have the power to conform, to adapt, or to coordinate, to the extent the commission deems proper, the practices, methods, standards, and rules and regulations governing the traffic in alcohol and alcoholic beverages, with the practices, methods, standards and rules and regulations established by an officer or agency of the United States government.

Plaintiffs cite the case of *Schakel v. Review Bd. of Indiana Employment Sec. Division,* 142 Ind.App. 475, 235 N.E.2d 497 (1968) in support of their position. The statute there in question provided that an individual's weekly reporting requirement could be waived by the director "upon a showing of good cause." The court was impressed with the lack of any clear definition of "good cause." The court went on to express dissatisfaction that the Board had not been granted any rulemaking authority to aid it in administering the law.

"Good cause" is not defined in the Act. The Board is not authorized to implement the Act by making rules which would lay down conditions and tests of general application to all cases within the legislative framework from which it could be determined to what classes of cases the broad legislative policy above mentioned should not apply. There is no rule or standard, legislative or otherwise, for the ascertainment of what is or is not "good cause" for waiving or modifying the denial of benefits. It seems to us the choice is left wholly to the unbridled discretion of the Board. The Board may find the facts, but, having found them is without any legal yardstick by which to measure the rights of the parties . . .

142 Ind.App. at 479; 235 N.E.2d at 500.

Title 7.1 consists of five articles which include 50 chapters in all. Many of these chapters are detailed and lengthy. The provisions of Title 7.1 provide the authority for and define the limits of the Commission's rulemaking powers. Also, in IC 7.1–1–1–1 the Indiana General Assembly set out its general legislative purpose as an additional guide to the interpretation of Title 7.1:

The general purposes of this title are: (a) To protect the economic welfare, health, peace and morals of the people of this state;

(b) To regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages; and,

(c) To provide for the raising of revenue.

The provisions of Title 7.1 contain ample standards to guide the ABC in its rulemaking function. *See, Indiana Alcoholic Beverage Commission v. McShane, supra.*

Plaintiffs urge that, because the Indiana General Assembly has enacted legislation in the area of trade regulation (Title 24 of the Indiana Code), the legislature has effectively preempted that area. There is no authority to support this contention. The argument also proves too much. Under plaintiffs' theory, the Commission would also be prevented from promulgating rules prohibiting criminal activity on licensed premises by virtue of the existence of the Indiana Criminal Code. Such is not the law of Indiana.

Plaintiffs also cite *Kealey Pharmacy and Home Care Services v. Walgreen Co.,* 539 F.Supp. 1357 (W.D.Wis., 1982) as holding that the legislature has the exclusive authority to enact economic regulations. This statement was made by the *Kealey* court in describing the powers of the legislature vis-a-vis the power of the courts. The case had nothing to do with the delegation of power to an administrative agency. It is also noteworthy that the *Kealey* court went on to note the discrediting of the substantive due process doctrine of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), which case the plaintiffs cite as authority throughout their brief.

The general authority of the ABC to promulgate rules governing the conduct of the business of a permittee is found in IC 7.1–2–3–7. Plaintiffs argue that the General Assembly did not intend that the ABC make use of this power to promulgate rules respecting "economic policy." This assertion is unsupported by any authority. The fact the General Assembly had specifically authorized the promulgation of rules with respect to certain questions of economic policy (the Fair Trade Act) does not indicate that the General Assembly intended that

the ABC be prohibited from promulgating any rules which further the economic policies of free competition. The power of the ABC to promulgate rules and regulations regarding the conduct of a permittee is not subject to the artificial limitations proposed by plaintiffs.

Rule 28 also furthers several other statutory purposes of Title 7.1. IC 7.1–5–9–2 provides as follows:

> It is unlawful for the holder of a beer brewer's permit to hold, acquire, possess, own, or control, or to have an interest, claim or title in or to an establishment, company, or corporation holding or applying for a beer wholesaler's permit under this title, or in its business.

In *Joseph Schlitz Brewing Co. v. Central Beverage Co.,* 172 Ind.App. 81, 359 N.E.2d 566 (1977), the Indiana Court of Appeals held that this section does not merely prohibit control through ownership, but other forms of control as well. In that case, a brewer's efforts to impose thirty internal controls on a wholesaler was held to violate the section. Clearly, if this section protects a wholesaler's managerial decision regarding internal controls, it also protects the wholesaler's business judgment as to who his customers will be. Rule 28 thus furthers the policy embodied in that section.

Other sections of Title 7.1 indicate the intent of the General Assembly that the ABC have broad power in the regulation of the business conduct of permittees. IC 7.1–2–3–22 gives the Commission the power to "ascertain the business relationships, including nonalcoholic beverage business relationships, between permittees under this title." Additionally, IC 7.1–5–5–9 prohibits wholesalers and brewers from attempting to coerce a beer wholesaler into entering into any agreement violating the provisions of the title or the rules of the Commission.

Plaintiffs' reliance on IC 7.1–3–3–17 in support of their contention that the General Assembly intended territory restrictions to be permitted is misplaced. That section authorizes a court to enjoin a brewer found in violation of IC 7.1–5–5–9 "from supply-

ing the customer or territory of the disfranchised wholesaler through another wholesaler." This section merely indicates that the legislature was aware of the prevalent use of exclusive territory agreements in 1965 when IC 7.1–3–3–17 was enacted.[5] It does not show a legislative intent that such agreements must be permitted.

IC 7.1–3–3–5, which defines the scope of a beer wholesaler's permit, indicates the intent of the General Assembly that a beer wholesaler be able to sell his products throughout the state. That section provides in pertinent part:

The holder of a beer wholesaler's permit may purchase, import, possess, and sell at wholesale, beer manufactured within or without this state. *A beer wholesaler permittee may possess, transport and sell, and deliver beer to another beer wholesaler authorized by the brewer to sell the brand purchased, to a consumer, or to a holder of a beer retailer's permit, beer dealer's permit, temporary beer permit, dining car permit, boat permit, airplane permit, supplemental caterer's permit, or supplemental retailer's permit, located within this state.* (Emphasis supplied).

### V.

■ Plaintiffs also attack the constitutionality of Rule 28 on the ground that it is void for vagueness under both the Fourteenth Amendment and the comparable provision of the Constitution of Indiana.

■ The due process prohibition against excessive vagueness will not invalidate every statute which a court of review believes could have been more precisely drafted. Rather, the Constitution requires only that the law give sufficient warning of the prohibited conduct so that persons may conduct themselves in such a way as to avoid it. *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). A law will not run afoul of the Constitution if it is drafted in such a way that persons of rea-

sonable intelligence are given a reasonable opportunity to know what is prohibited. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

While neither Title 7.1 nor the rules define the term "area of primary responsibility," the use of this language, as plaintiffs admit, is "commonplace in wholesaler appointment agreements." (Plaintiffs' brief at 29). The expression is thus common usage in the wholesale beer industry. The term is used in the rule to exclude certain promotion and service provisions which are commonly found in wholesaler appointment agreements. While brewers could perhaps misuse these provisions and thereby effectively violate the prohibition against territorial agreements, this possibility does not make the rule unconstitutionally vague. Nor does the alleged prevalence of "anti-high spotting" provisions in wholesaler appointment contracts make the rule impermissibly indefinite. The conduct which the rule prohibits is clear. That certain brewers could violate the rule through the use of ingeniously worded contractual agreements does not render the rule unconstitutional.

### VI.

■ The two remaining issues raised in plaintiffs' first amended complaint, but not argued in their brief, should also be disposed of through summary judgment. First, plaintiffs allege that Rule 28 impermissibly impairs the obligations of contract and hence violates Article I, Section 10 of the Constitution of the United States. There is nothing before this court to show that Rule 28 impaired any existing contractual obligations. The wholesaler agreements which plaintiffs allege are impaired by Rule 28 are not shown to have been in effect at the time of the promulgation of Rule 28. Article I, Section 10 is inapplicable to contracts entered into at the time the law complained of was in force. *Abilene National Bank v. Dolly,* 228 U.S. 1, 33 S.Ct.

---

**5.** Plaintiffs' argument that Title 7.1 mandates a three-tiered distribution system was flatly rejected in the case of *Beer Distributors of Indi-* *ana, Inc. v. State ex rel Indiana Alcoholic Beverage Commission,* Ind.App., 431 N.E.2d 836 (1982).

409, 57 L.Ed. 707 (1912). The state possesses the broad power to adopt regulatory measures pursuant to their police powers, and should not have to be concerned that private contracts will be impaired as a result. Otherwise, one could obtain immunity from state regulations by entering into private contractual arrangements. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505. 52 L.Ed.2d 92 (1977).

Plaintiffs also allege in Count VII of the first amended complaint that Rule 28 "creates an arbitrary and capricious classification, improperly distinguishing between rural wholesalers and urban wholesalers." Of course, the first problem with this allegation is that Rule 28 does not distinguish between different classes of wholesalers—the provisions apply equally to rural and urban wholesalers. Thus, plaintiffs' claim must revolve around an alleged disparity of impact on the two "classes" of wholesalers. While this disparity has not been shown, even if plaintiffs were able to show disproportionate impact it would not render Rule 28 unconstitutional. Plaintiffs are neither members of a suspect class, nor are their fundamental rights under the Constitution affected by the Rule. Rather, as the citations to *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), in plaintiffs' brief indicate, plaintiffs are really asking this court to reinstate the discredited line of cases of the substantive due process era. See, *Pollard v. Cockrell,* 578 F.2d 1002 (5th Cir.1978).

The apparent attempt of the plaintiffs to rely on *Lochner v. N.Y.* is most interesting. What generally survives from *Lochner* is the famous Holmes dissenting comment that "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics." 198 U.S. at 75, 25 S.Ct. at 546. Also, the dissent of the first Justice Harlan should be remembered:

I do not stop to consider whether any particular view of this economic question presents the sounder theory. What the precise facts are it may be difficult to say. It is enough for the determination of this case, and it is enough for this court to know, that the question is one about which there is room for debate and for an honest difference of opinion. There are many reasons of a weighty, substantial character, based upon the experience of mankind, in support of the theory that, all things considered, more than ten hours steady work each day, from week to week, in a bakery or confectionery establishment, may endanger the health and shorten the lives of the workmen, thereby diminishing their physical and mental capacity to serve the state and to provide for those dependent upon them.

If such reasons exist that ought to be the end of this case, for the state is amenable to the judiciary, in respect of its legislative enactments, unless such enactments are plainly, palpably, beyond all question, inconsistent with the Constitution of the United States.... *Id.,* at 72, 25 S.Ct. at 550.

The substantive due process ideas of the majority in *Lochner* were given a decent burial in *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

The Minnesota Supreme Court, when faced with a similarly broad constitutional attack on a statute having the effect of prohibiting exclusive territories among liquor wholesalers, stated as follows:

As a constitutional principle, it is well established that the freedom to contract with respect to one's property and in the conduct of a lawful business to select the party with whom one chooses to do so is a part of the liberty protected by the due process clauses of the State and Federal Constitutions. But, as declared in *Nebbia v. New York,* 291 U.S. 502, 523, 54 S.Ct. 505, 510, 78 L.Ed. 940, 948 (1934):

" * * * [N]either property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

It is elementary that the state by virtue of its sovereignty may regulate private conduct for public benefit. In the field of economic regulation, without burdening this opinion by a historical recital of the changing attitude of the nation's courts, it is settled that the legislature is free to adopt whatever economic policy it deems will promote the public good.

(Footnote omitted). *Federal Distillers, Inc. v. State* [304 Minn. 28], 229 N.W.2d [144] at 157 (S.Ct. Min., 1975).

Needless to say, the Minnesota Supreme Court in the *Federal Distillers* case rejected the constitutional attack on the Minnesota statute. That Court was absolutely correct in doing so.

## VII.

▆▆▆ Considerable mention is made of the fact that the current Alcoholic Beverage Commission Chairman has condemned Rule 28 in recent press interviews. As a matter of preferable public policy he may well be correct. His statements are not binding judicial admissions under Rule 33 F.R.C.P. They are a general expression of opinion as to desirable public policy. If it is desirable public policy for the Indiana Alcoholic Beverage Commission to withdraw its Rule 28 it is entirely free to do so. That policy decision is there, not here. Likewise, the General Assembly of Indiana is free to proscribe the limits and content or Rule 28 in part or in whole. In this context the plaintiffs cite a 1982 enactment of the Indiana General Assembly found in IC 7.1–2–3–4.5 which states:

> The Commission and the Chairman may exercise only those express powers enumerated in this Title; however, this section does not limit the powers granted to the Commission by Section 31 [7.1–2–3–31].

This court finds and holds that the Indiana Alcoholic Beverage Commission had the authority to promulgate Rule 28 before this 1982 enactment and such was not intended to undermine preexisting authority and did not do so.

## CONCLUSION

It is all too tempting for a judge who is exercising the enormous grant of power under Article III of the Constitution of the United States to dive headlong into areas of social, political and economic policymaking. Any judge who is so tempted should be required to read the great dissent of the first Justice Harlan in *Pollock v. Farmers Loan and Trust Co.*, 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895). See also the comments of this court in *Hines v. Elkhart General Hospital*, 465 F.Supp. 421, 434 (N.D.Ind.1979), aff'd, 603 F.2d 646 (7th Cir. 1979), and *Dague v. Piper Aircraft Corp.*, 513 F.Supp. 19, 28 (N.D.Ind.1980), aff'd., 654 F.2d 727 (7th Cir.1981). It is not for this court to subjectively rewrite the Alcoholic Beverage Regulations of the State of Indiana. It is not for this court to impose its beliefs and values with regard to alcoholic beverage regulations upon the citizens of the State of Indiana absent a clear mandate by the Constitution of the United States to do so. There is no such mandate apparent in the record in this case. The regulation in question is well within the sweep of state authority as guaranteed 50 years ago in the Twenty-first Amendment of the Constitution of the United States. The regulation in question suffers from no federal constitutional infirmity under either the Due Process Clause, the Equal Protection Clause, or the impairments of contract clause in Article I. The General Assembly of the State of Indiana has broad authority under general police powers and especially under the Twenty-first Amendment to engage in the regulation of the distribution of alcoholic beverages. It is well within the authority of the General Assembly of the State of Indiana to delegate the administration of such regulations and certain rule-making authority to the Alcoholic Beverage Commission. It has done so in this case and in doing so has not violated either the Constitution of the United States or the Constitution of the State of Indiana. Thus, Rule 28 passes constitutional muster under both.

Therefore, the plaintiffs' Motion for Summary Judgment is DENIED and the de-

fendants' Motion for Summary Judgment is GRANTED. The Clerk shall enter judgment accordingly. Each party will bear its own costs.